1998-NMSC-021

962 P.2d 1253

**Rudy J. GONZALES, D.C.,**
Petitioner–Appellee,

v.

**NEW MEXICO BOARD OF CHI-
ROPRACTIC EXAMINERS,**
Respondent–Appellant.

No. 24096.

Supreme Court of New Mexico.

July 15, 1998.

Tom Udall, Attorney General, Patrick T. Simpson, Sally Malave, Assistant Attorneys General, Santa Fe, for Appellant.

Jose A. Sandoval, Espanola, for Appellee.

## OPINION

MINZNER, Justice.

{1} The New Mexico Board of Chiropractic Examiners (Board) appeals the district court's reversal of its decision to suspend the license to practice chiropractic issued to Rudy J. Gonzales, D.C. Contrary to the conclusion of the district court, the Board argues that its decision is supported by substantial evidence. We agree. We therefore reverse the decision of the district court and remand with instructions to reinstate the order of the Board.

## I. FACTS AND PROCEDURE

{2} On February 28, 1994, Margaret Kilgore sought and received treatment from Dr. Gonzales at his office in Espanola. She had received treatment from him for about a year prior to that date and had received care for her neck and lower back from other chiro-

practors for approximately twenty years. Kilgore felt fine before treatment aside from her usual neck pain. Kilgore testified that she believed that there was nothing unusual about the treatment procedure on February 28, though Dr. Gonzales did not do an initial evaluation, an examination often performed by doctors of chiropractic that includes the taking of a patient's history and blood pressure and palpating the carotid arteries.

{3} During the course of her treatment, Dr. Gonzales manipulated Kilgore's neck. Afterward, Dr. Gonzales left the room, and Kilgore immediately experienced dizziness and vomited. When Dr. Gonzales returned, he escorted Kilgore to the restroom where she vomited again. Dr. Gonzales and Kilgore returned to the treatment room, and he manipulated Kilgore's neck again. Because of her dizziness and difficulty walking, Dr. Gonzales helped Kilgore to her car. Kilgore could not drive due to her condition, so she waited in her car and vomited again.

{4} About four hours later, Dr. Gonzales noticed Kilgore in her car, assisted her back to the exam room, and manipulated her neck a third time. He asked Kilgore if she wanted to go to the hospital, if she wanted an ambulance, or if he could call a family member for her. Dr. Gonzales did not comment on Kilgore's condition. Kilgore declined Dr. Gonzales's offer to seek assistance. Dr. Gonzales once again assisted Kilgore to her car. Approximately two hours later, while Kilgore was still in her car at his office, Dr. Gonzales and his wife offered assistance. Kilgore refused medical attention because she did not want to alarm her family. As a result, Dr. Gonzales and his wife offered to let Kilgore stay at their house to recover, and Kilgore accepted.

{5} At Dr. Gonzales's house, Kilgore continued to vomit through the night, but in the morning, she experienced only a headache and some dizziness. Dr. Gonzales manipulated her neck in the morning at his home and again, after Kilgore was too dizzy to leave, in the evening. Kilgore stayed another night. The next morning, upon seeing Dr. Gonzales, Kilgore requested that he not manipulate her neck again because she experienced dizziness each time he did so. Despite Kilgore's

wishes, Dr. Gonzales manipulated her neck another time. At noon, Dr. Gonzales called Kilgore's daughter, Kathryn Castillo, at Kilgore's request, and Castillo picked up Kilgore later in the day. Castillo drove Kilgore back to Albuquerque and took her to University Hospital. At the hospital, Kilgore was admitted with at diagnosis of left cerebellar stroke caused by a left vertebral artery dissection. She underwent surgery due to hydrocephalus and was hospitalized for three weeks.

{6} After Corey Ford, M.D., a neurologist who treated Kilgore at University Hospital, initiated a complaint against Dr. Gonzales for his care of Kilgore, the Board conducted a hearing to determine whether to take disciplinary action against Dr. Gonzales. At the hearing, Kilgore and Castillo testified to the events described above. In addition, three experts testified before the Board: Jack Zipper, D.C., the State's expert, whom the Board qualified as an expert in chiropractic care; Richard A. Farris, D.C., Dr. Gonzales's witness, whom the Board also qualified as an expert in chiropractic care; and Dr. Ford, whom the Board qualified as an expert in neurology. Based on the testimony of these experts, as well as the testimony of Kilgore and Castillo, the Board determined that Dr. Gonzales committed acts and omissions constituting gross negligence in the practice contrary to NMSA 1978, § 61–4–10(A)(16)(f) (1993), committed repeated similar acts of negligence contrary to Section 61–4–10(A)(16)(i), and engaged in conduct unbecoming a person licensed to practice chiropractic and detrimental to the best interests of the public contrary to Section 61–4–10(A)(16)(q). As a result, the Board suspended Dr. Gonzales's license for six months and ordered thirty-six hours of continuing education in differential diagnosis and physical examination.

## II. STANDARD OF REVIEW

{7} As with all disciplinary decisions under the Uniform Licensing Act at present, a reviewing court may reverse the decision of the Board only

if the substantial rights of the petitioner have been prejudiced because the adminis-

trative findings, inferences, conclusions or decisions are: in violation of constitutional provisions; or in excess of the statutory authority or jurisdiction of the board; or made upon unlawful procedure; or affected by other error of law; or unsupported by substantial evidence on the entire record as submitted; or arbitrary or capricious.

NMSA 1978, § 61–1–20 (1957, repealed effective Sept. 1, 1998).[1] The district court reversed the Board's ruling on the basis that there was not substantial evidence to support the Board's findings and conclusions and that the lack of substantial evidence resulted in prejudice to Dr. Gonzales's substantial rights. On direct appeal to this Court pursuant to NMSA 1978, § 61–1–23 (1957, repealed effective Sept. 1, 1998),[2] the Board contends that the district court erred by conducting a de novo weighing of the evidence rather than a limited review for substantial evidence.

■ {8} "[T]his Court must conduct the same review as the district court while at the same time determining whether the district court erred in the first appeal." *Padilla v. Real Estate Comm'n*, 106 N.M. 96, 97, 739 P.2d 965, 966 (1987); *accord Oden v. State Regulation & Licensing Dep't*, 1996–NMSC–022, ¶ 6, 121 N.M. 670, 916 P.2d 1337. Thus, in reviewing the district court's reversal of the Board's decision, we must determine whether substantial evidence exists to support the findings of the Board and whether Dr. Gonzales's substantial rights have been prejudiced.

■ {9} "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Duke City Lumber Co. v. New Mexico Envtl. Improvement Bd.*, 101 N.M. 291, 293, 681 P.2d 717, 719 (1984) (quoting *Rinker v. State Corp. Comm'n*, 84 N.M. 626, 627, 506 P.2d 783, 784 (1973)). In evaluating whether sub-

stantial evidence exists, this Court "may properly give special weight and credence to findings concerning technical or scientific matters by administrative bodies whose members, by education, training or experience, are especially qualified and are functioning within the perimeters of their expertise." *McDaniel v. New Mexico Bd. of Med. Exam'rs*, 86 N.M. 447, 450, 525 P.2d 374, 377 (1974). Additionally, we view the evidence in a light most favorable to the decision of the Board, and we defer to the Board's evaluation of the weight of evidence and the credibility of witnesses. *See Chavez v. Mountain States Constructors*, 1996–NMSC–070, ¶ 20, 122 N.M. 579, 583–84, 929 P.2d 971, 976–77 ("We will generally defer to an agency's factual determination, especially if the factual question concerns matters that fall within the agency's area of specialization."). Our review, however, is not limited to the evidence supporting the Board's decision; because the Board serves the dual role of fact-finder and prosecutor, we review the record as a whole. *Duke City Lumber Co.*, 101 N.M. at 294, 681 P.2d at 720.

## III. EXPERT TESTIMONY IN DISCIPLINARY PROCEEDINGS

{10} The Legislature has listed gross negligence, Section 61–4–10(A)(16)(f), and repeated similar acts of negligence, Section 61–4–10(A)(16)(i), as unprofessional conduct that may serve as grounds for suspending or revoking a license to practice chiropractic. Based on findings that Dr. Gonzales's acts fell below the standard of chiropractic care, the Board concluded that Dr. Gonzales had been grossly negligent and had committed repeated similar negligent acts. Dr. Gonzales claims that there is not substantial evidence in the record to support these findings. He claims that he is being held to a standard applicable only to him and that the Board relied on its own expertise rather than

---

1. The Legislature recently promulgated a uniform standard of review applying to decisions of administrative agencies, somewhat modifying the standard of review currently articulated in the Uniform Licensing Act, NMSA 1978, § 61–1–1 to –33 (1957, as amended through 1993). 1998 NM Laws, ch. 55, § 1 (to be codified at NMSA 1978, § 12–8A–1(D)).

2. In the recent legislative enactment, the Legislature provided for discretionary appeals to the Court of Appeals from decisions of the district court. 1998 NM Laws, ch. 55, § 1 (to be codified at NMSA 1978, § 12–8A–1(E)).

evidence in the record to reach its decision. Dr. Gonzales argues that due process requires expert testimony depicting the standard of care in the community in order to suspend a professional license. The Board, in response, contends that expert testimony is not necessary to determine the standard of chiropractic care because that is a matter particularly within the expertise of the Board itself and appellate courts should defer to the Board's expertise.

{11} In *Weiss v. New Mexico Board of Dentistry*, 110 N.M. 574, 583, 798 P.2d 175, 184 (1990), a dentist challenged an administrative board's disciplinary action because it was taken without the benefit of expert testimony. The Board of Dentistry in *Weiss* had revoked the dentist's license following four felony convictions for submitting false claims of reimbursement. The Board based its action on those convictions and on the dentist's failure to practice dentistry in a professionally competent manner. *Weiss*, 110 N.M. at 577, 798 P.2d at 178. With respect to both grounds for the disciplinary action, we rejected the argument that expert testimony was necessary for the license revocation. *Id.* at 583, 798 P.2d at 184. We concluded that the existence of the underlying convictions was not at issue, thereby making it unnecessary to establish the convictions through expert testimony. *Id.* Additionally, in response to the argument that expert testimony was required to establish a failure to practice in a professionally competent manner, we stated that "where the agency conducting the hearing is itself composed of experts qualified to make a judgment as to the licensee's adherence to standards of professional conduct, *see* [NMSA 1978, § 61–1–11(C) (1981) ], there is no need for the kind of assistance an expert provides in the form of an opinion under Rule 11–702 of the Rules of Evidence." *Id.*

{12} In taking this position in *Weiss*, we aligned ourselves with a substantial minority of jurisdictions that do not require expert testimony in such matters. *See, e.g., Levinson v. Connecticut Bd. of Chiropractic Exm'rs*, 211 Conn. 508, 560 A.2d 403, 412–13 (1989) (listing cases and applying minority position of not requiring expert testimony). We did so in order to effectuate the intent of

the Legislature. The Legislature, in creating the Board of Dentistry, determined that a majority of the board shall be composed of experts in the relevant field. *See* NMSA 1978, § 61–5A–8 (1994). The Legislature provided for a certain level of internal self-regulation, subject to limited judicial review, by granting the Board of Dentistry power over licensure and discipline. *See* NMSA 1978, § 61–5A–2 (1994) (describing issuance of licenses and discipline as among the primary duties of board of dental health); NMSA 1978, § 61–5A–10(F) (1994) (listing specific powers and duties). Further, the Legislature has provided that "[b]oards and hearing officers may utilize their experience, technical competence and specialized knowledge in the evaluation of evidence presented to them." Section 61–1–11(C). Thus, our conclusion in *Weiss* reflected the Legislature's intent not to require expert testimony to determine a standard of professional competence against which to judge the actions of a particular dentist. *See Weiss*, 110 N.M. at 583, 798 P.2d at 184 (citing Section 61–1–11).

{13} These considerations apply with equal force to the Board of Chiropractic Examiners. Unlike a jury, a majority of the members of the Board have a degree of expertise which allows for a greater ability to draw inferences from expert and non-expert testimony. *See* NMSA 1978, § 61–4–3(A) (1993). Additionally, the Board possesses licensure and disciplinary powers, *see, e.g.,* § 61–4–3(F), (I), and is governed by the same statutory rule of evidence noted in *Weiss* that allows the use of the Board's expertise in evaluating evidence, *see* § 61–1–11(C). Therefore, we do not believe that the Legislature intended to require expert testimony in order to establish the standard of care for disciplinary actions against chiropractors.

{14} We recognize that a slight majority of jurisdictions have chosen to require expert testimony in determining a standard of care and whether a professional's conduct fell below that standard in order to revoke or suspend a professional license. *See, e.g., In re Appeal of Schramm*, 414 N.W.2d 31, 35–36 (S.D.1987) (listing cases and adopting majority position). These jurisdictions have re-

quired expert testimony primarily for three reasons. *Id.* First, a professional license is a constitutionally protected property right, and professional licensees facing license revocation or suspension must be afforded due process, often including the opportunity to cross-examine witnesses at a hearing. *See Mills v. New Mexico State Bd. of Psychologist Exam'rs,* 1997–NMSC–028, ¶ 14,123 N.M. 421, 941 P.2d 502. As a result, a number of courts have reasoned that the opportunity to cross-examine witnesses would be frustrated by the absence of expert testimony. *See Schramm,* 414 N.W.2d at 35. Second, boards in many states, like the Board of Chiropractic Examiners, are composed of both experts and lay persons. As a result, a number of courts have relied on the composition of professional boards to conclude that the absence of expert testimony disrupts the balance in the mixed membership by giving too much power to the expert members. *See id.* Finally, a number of courts have relied on the importance of effective judicial review. *Id.* at 35–36. Without the requirement of expert testimony, courts have reasoned that a board could rely on knowledge and expertise outside of the record. This practice "would render [the] appellate court's review meaningless, as absent expert testimony, we cannot, by telepathy, act as mind readers determining from an empty record the factual determinations of the Board members." *Id.* at 36.

{15} We believe each of these considerations is important, though we do not believe that they are sufficient to overcome our interpretation of the Uniform Licensing Act. Given these considerations, however, we feel it is necessary to clarify our holding in *Weiss.* We affirm our earlier construction of the Uniform Licensing Act in *Weiss* and hold that expert testimony is not required in order to establish negligence or a failure to comply with the standards of Section 61–4–10(A)(16). Nevertheless, this holding like our holding in *Weiss,* should not be construed as altering the standard of review articulated in the Act. We are bound to apply the requirements of the Act and to protect licensees' rights to due process by requiring that the Board rely on substantial evidence in reaching its decision. We will defer to the Board's expert interpretation of evidence, but we will not allow the Board to take disciplinary action without substantial evidence in the record to justify the application of the Board's expertise. Thus, if there is uncontradicted evidence in the record that a chiropractor has complied with the standard of care, the Board would be outside its statutory authority, and outside the requirements of due process, in going beyond the record to rely on its own knowledge and skill as the basis for finding a violation of the standard of care. *Cf. In re Williams,* 60 Ohio St.3d 85, 573 N.E.2d 638, 640 (1991) (noting that expert testimony is not required in every case but requiring substantial evidence for decision and stating that a board "cannot convert its own disagreement with an expert's opinion into affirmative evidence of a contrary proposition where the issue is one on which medical experts are divided and there is no statute or rule governing the situation").

{16} This limitation on a board's authority would not apply to patent violations of the standard of care, *see Schramm,* 414 N.W.2d at 37; *cf. Pharmaseal Lab., Inc. v. Goffe,* 90 N.M. 753, 758, 568 P.2d 589, 594 (1977) ("[I]f negligence can be determined by resort to common knowledge ordinarily possessed by an average person, expert testimony as to standards of care [in medical malpractice actions] is not essential."), or to disciplinary matters unrelated to negligence and necessarily within the internal self-regulation prerogative of the profession, *cf.* Section 61–4–3(F) (delegating authority to the Board to promulgate rules and regulations). Further, we do not intend to limit the power of the Board to take notice of facts within the members' expertise, so long as the licensee is "notified either before or during the hearing of the fact so noticed and its source and [is] afforded an opportunity to contest the fact so noticed." Section 61–1–11(B). Finally, we do not intend to limit the ability of the Board to reject expert testimony that the licensee complied with the standard of care, or other expert testimony, so long as the Board's ultimate action is supported by substantial evidence. *See In re Grimm,* 138 N.H. 42, 635 A.2d 456, 464 (1993) ("[W]e note that the board may reject uncontradict-

**424**

ed opinion testimony that its own expertise renders unpersuasive."); *see also Van Orman v. Nelson*, 78 N.M. 11, 23, 427 P.2d 896, 908 (1967) (stating general rule that trier of fact is free to reject uncontradicted expert opinion testimony and that the opinion of an expert, although uncontradicted, is not conclusive of the fact in issue); *Dickenson v. Regent of Albuquerque, Ltd.*, 112 N.M. 362, 363, 815 P.2d 658, 659 (Ct.App.1991) (same). With these principles in mind, we turn to the facts of this case.

## IV. SUBSTANTIAL EVIDENCE

{17} Dr. Gonzales argues that the Board's decision is not supported by substantial evidence. Specifically, Dr. Gonzales focuses his attack on finding 37:

Respondent's failure to fully inform Patient of the possible dangers indicated by her symptoms, or to refer her to a practitioner more qualified than he to assess and evaluate Patient's symptoms and condition, and his failure to insist more firmly on medical attention between February 28, 1994 and March 2, 1994, failed to meet the standard of care required of Doctors of Chiropractic practicing in New Mexico at that time.

Dr. Gonzales contends that there is not substantial evidence for this finding. We agree.

{18} The record in this case reflects expert testimony by two chiropractors and one physician. Based on the testimony of the three experts at the hearing, there is no evidence from which to infer that Dr. Gonzales's actions described in finding 37 fell below the standard of care. Dr. Ford testified that a doctor cannot force a patient to seek medical treatment. Similarly, Dr. Zipper testified that, under the circumstances, there may not have been a duty to inform Kilgore of the potential consequence of her symptoms. Additionally, Dr. Zipper testified that, although it was "unfortunate" that Dr. Gonzales did not more fully inform Kilgore of the possible urgency of her condition and that he did not "press harder" to get her to a hospital, he could "certainly give Dr. Gonzales a lot of leeway on the issue of the patient going to the hospital, and Dr. Ford said the same thing. You can't make them

go." Dr. Zipper referred to the propriety of Dr. Gonzales's actions in this regard as "a great area of gray." Finally, Dr. Farris testified that Dr. Gonzales acted prudently in his attempts to get Kilgore to a hospital. There is no evidence in the record from which the Board, using its expertise, could infer a violation of the standard of care with respect to these acts by Dr. Gonzales. Therefore, taking the evidence as a whole, we conclude that finding 37 is not supported by substantial evidence.

{19} Nevertheless, this conclusion does not end our inquiry. The Board does not commit reversible error by making a finding unsupported by substantial evidence unless "the substantial rights of the petitioner have been prejudiced." Section 61–1–20. As a result, we must determine which findings of fact are supported by substantial evidence, evaluate the Board's conclusions of law, and determine whether the Board correctly applied the law based on those findings of fact which are supported by substantial evidence.

{20} In its findings of fact, the Board found: (1) that Dr. Gonzales manipulated Kilgore's neck on March 2, 1994, over Kilgore's objections; (2) that he violated the standard of care by failing to recognize the symptoms of vertebral artery dissection "when their onset followed so closely [after] his initial manipulation of [Kilgore's] neck;" (3) that he violated the standard of care by repeatedly remanipulating Kilgore's neck after the onset of her symptoms; and (4) that he violated the standard of care when he continued to treat Kilgore in a non-clinical setting which lacked the proper equipment, staff, and supervision. We conclude that each of these findings is supported by substantial evidence.

{21} Dr. Zipper testified that Dr. Gonzales's conduct was "well below the appropriate standard of what a chiropractor should have done." He testified that, based on a generally accepted view, a prudent chiropractor should recognize the symptoms of vertebral arterial dissection and, upon recognition, should not remanipulate the patient. According to Dr. Zipper, remanipulation, in light of the symptoms displayed by Kilgore

and over Kilgore's objection, was inappropriate. Specifically, Dr. Zipper described the remanipulations as "irresponsible," "very inappropriate," and "absolutely unconscionable." Dr. Zipper concluded that Dr. Gonzales's actions were negligent.

{22} Dr. Gonzales points to the testimony of his witness, Dr. Farris, and claims that the Board ignored Dr. Farris's testimony. Dr. Farris testified that it was not unreasonable to fail to recognize the symptoms of stroke. He also testified that Dr. Gonzales did not act negligently in relation to Kilgore.

■ {23} The Board, however, was free to reject Dr. Farris's expert testimony. "Although conflicting testimony was presented ..., evidence of two conflicting opinions in the record does not mean that the decision arrived at is unsupported by substantial evidence." *Attorney Gen. v. New Mexico Pub. Serv. Comm'n,* 101 N.M. 549, 553, 685 P.2d 957, 961 (1984), *quoted in Attorney Gen. v. New Mexico State Corp. Comm'n (In re Rates and Charges of U.S. West Communications, Inc.),* 121 N.M. 156, 163, 909 P.2d 716, 723 (1995). In our role as a reviewing court, we leave to the Board the weighing of Dr. Farris's testimony against that of Dr. Zipper. The record supports the Board's decision to reject Dr. Farris's testimony. For example, in response to the question whether he would have remanipulated a patient after the onset of symptoms consistent with Kilgore's immediately following an initial manipulation, Dr. Farris responded, "I doubt it." The Board could rely on its own expertise, as well as Dr. Farris's equivocation, as a basis for rejecting the testimony.

{24} While the Board could not use its rejection of Dr. Farris's testimony as affirmative evidence against Dr. Gonzales, the testimony of Dr. Zipper provided substantial evidence to establish a violation of the standard of care. Taking the record as a whole, based on the expert testimony, and based on the number of times Dr. Gonzales remanipulated Kilgore's neck after the initial dissection of the artery (at least five times), a reasonable mind could draw the conclusion that Dr. Gonzales's actions fell below the standard of care. Therefore, consistent with the standard of review outlined above, we conclude that the Board, properly utilizing its expertise in evaluating the evidence, correctly applied the law to the facts in concluding that Dr. Gonzales committed gross negligence and repeated similar acts of negligence.

■ {25} We also conclude that the Board acted properly in concluding that Dr. Gonzales engaged in conduct unbecoming a licensed chiropractor and conduct detrimental to the best interests of the public. Dr. Gonzales did not dispute that he treated Kilgore at his home. We believe it is within the professional expertise of the Board to decide whether the lack of proper equipment, support, and supervision in a non-clinical setting causes this conduct to be inappropriate and "unbecoming a person licensed to practice chiropractic or detrimental to the best interests of the public." Section 61–4–10(A)(16)(q). We believe such matters, involving the manner in which chiropractic treatment is to be dispensed, are largely within the discretion of the Board, subject to a general requirement of reasonableness. We, therefore, defer to the Board's expertise in determining the type of conduct that is detrimental to the public or unbecoming in the profession. We conclude that the Board acted reasonably in proscribing Dr. Gonzales's treatment of Kilgore in a non-clinical environment lacking the proper equipment, support, and supervision.

■ {26} Further, we believe there is substantial evidence that Dr. Gonzales manipulated Kilgore's neck over her objection. Kilgore testified that she asked Dr. Gonzales not to manipulate her neck on March 2 because it made her dizzy; he did so anyway. Additionally, Dr. Zipper testified that the manipulation on March 2 over Kilgore's objection constituted assault and was inappropriate. The Board was well within its statutory authority to conclude that such conduct is detrimental to the best interests of the public. In fact, we believe that this is the type of patent violation of the standard of care for which the Board may rely on its own expertise. *Cf. Gerety v. Demers,* 92 N.M. 396, 407, 589 P.2d 180, 191 (1978) (distinguishing between an action for battery and

one for medical malpractice based on a lack of informed consent and stating that "[i]n battery cases it has generally been held that expert medical testimony is not required to establish a standard of care").

{27} Given our conclusion that numerous findings of fact support the Board's conclusions of law, we will not disturb the order of the Board. *See Bill McCarty Constr. Co. v. Seegee Eng'g Co.*, 106 N.M. 781, 782, 750 P.2d 1107, 1108 (1988) ("This Court has noted that when a judgment rests on one or more findings of fact, there is substantial evidence to support the judgment."). We view the decision of the Board in context with the punishment imposed, a six-month suspension of Dr. Gonzales's license, and in context with the primary focus of Dr. Zipper's testimony on Dr. Gonzales's remanipulations. In addition, we note the number of findings relating to the remanipulations as compared to the single finding relating to Dr. Gonzales's efforts to persuade Kilgore to seek medical care. We conclude that the lack of substantial evidence for finding 37 did not prejudice the substantial rights of Dr. Gonzales because the ultimate decision of the Board is supported by substantial evidence.

## V. CONCLUSION

{28} We determine that expert testimony is not required to establish a violation of the standard of care pursuant to Section 61–4–10(A). We conclude that, with the exception of finding 37, the Board's findings of fact are supported by substantial evidence and that the Board correctly applied the law to the facts. There was substantial evidence that the remanipulations of Kilgore's neck fell below the standard of chiropractic care in New Mexico. Additionally, Dr. Gonzales continued to treat Kilgore at his home without the proper equipment, staffing, or supervision. It is within the discretion of the Board to determine that this is conduct unbecoming a person licensed to practice chiropractic in New Mexico. Finally, Dr. Gonzales manipulated Kilgore's neck over her express wishes to the contrary. We conclude that the Board properly exercised its discretion to conclude that this is conduct detri-

mental to the best interests of the public. Therefore, we reverse the decision of the district court and remand with instructions to reinstate the order of the Board.

{29} **IT IS SO ORDERED.**

FRANCHINI, C.J., and BACA and SERNA, JJ., concur.

McKINNON, J., specially concurring.

McKINNON, Justice, specially concurring.

While I am in substantial agreement with Justice Minzner's analysis and determination that the Board's decision was supported by substantial evidence, I am concerned that our court continues to support a minority view that expert testimony is *not* required to revoke a professional's license for failure to practice in a competent manner. Basic concepts of due process mandate that expert testimony be adduced by the Board in its prosecutorial role establishing professional incompetence. The fact that "experts" may be conducting the revocation hearing without more is not sufficient. The absence of expert testimony renders the right to judicial review illusory or meaningless. Fortunately here, such testimony was adduced and thereby furnished substantial evidence to support a determination of professional incompetence. Thus, I would also reinstate the order of the Board.