2006-NMCA-069

137 P.3d 619

**NEW MEXICO BOARD OF VETERINARY MEDICINE, Appellee–Petitioner,**

v.

**Michael H. RIEGGER, D.V.M., Appellant–Respondent.**

No. 25,610.

Court of Appeals of New Mexico.

April 20, 2006.

Certiorari Granted, No. 29,790, June 14, 2006.

Patricia A. Madrid, Attorney General, Jerome Marshak, Assistant Attorney General, Santa Fe, NM, for Petitioner.

Bannerman & Williams, P.A., Charlotte Lamont, Albuquerque, NM, for Respondent.

## OPINION

KENNEDY, Judge.

{1} We affirm the district court, holding that the Board of Veterinary Medicine (the Board) cannot sanction its licensees for acts of ordinary negligence arising out of a single episode of care under NMSA 1978, § 61–14–13(A)(5) (1999). We reverse the district court's disallowances of the costs of this administrative action. We hold that NMSA 1978, § 61–1–4(G) (2003), which states that licensees must generally bear all costs of the disciplinary proceedings against them, is not limited by the terms of Rule 1–054(D) NMRA and that the legislature did not intend for Rule 1–054(D) to be read into Section 61–1–4(G). Issue (B)(3) is the district court's disallowance of the Board members' per diem and mileage as a cost that may be assessed against a disciplined licensee. On this issue, the panel is divided. The author's opinion on this issue represents a dissenting view. Judge Pickard's opinion, following the main opinion, represents the majority opinion on this issue. We therefore remand to the district court for a hearing to determine the proper measure of the other costs to be assessed in this case.

## FACTS AND BACKGROUND

{2} Riegger is a veterinarian. This case concerns the disciplinary proceeding brought against him following his treatment of a horse named Eagle.

{3} Eagle's owner hired Riegger to perform follow-up care after Eagle had at least two surgeries at Colorado State University. After Eagle experienced more problems, Riegger recommended surgery. Riegger performed the surgery on October 1, 1999. Following surgery, Eagle was unable to stand and was suffering. Eagle was euthanized at approximately 8:00 a.m. the following morning.

{4} Eagle's owner complained to the Board that Riegger's treatment of Eagle was malpractice and cruelty. A hearing was held before a hearing officer pursuant to the Uniform Licensing Act (ULA), NMSA 1978, §§ 61–1–1 to –33 (1957, as amended through 2003), and the Veterinary Practice Act (VPA), NMSA 1978, §§ 61–14–1 to –20 (1967, as amended through 2005).

{5} Following the hearing, the Board considered Riegger's case. See § 61–1–13(A) ("After a hearing has been completed, the members of the [B]oard shall proceed to consider the case[.]"). It disagreed with the hearing officer's determinations in several respects. The hearing officer had found the Board could not discipline a licensee for acts of ordinary negligence under Section 61–14–13(A)(5) of the VPA. The Board disagreed, determining that it had the statutory authority to discipline Riegger for acts of ordinary negligence.

{6} While agreeing with the hearing officer that Riegger had committed a negligent act during surgery and grossly negligent and cruel acts following surgery, the Board found fault with several of the hearing officer's findings. Contrary to the hearing officer's findings, the Board found that Riegger had committed a number of preoperative negligent acts and that one of those acts was also grossly negligent. The Board also found that one post-operative act was grossly negligent where the hearing officer had found otherwise. In addition to ordering probation and continuing education, the Board ordered Riegger to pay the costs of the disciplinary proceeding in the amount of $22,021.83.

{7} Pursuant to Rule 1–074 NMRA, Riegger appealed to the district court. The court found that the Board was incorrect in interpreting Section 61–14–13(A)(5) of the VPA as authorizing discipline against a licensee for acts of ordinary negligence. It concluded that Riegger should not be sanctioned for acts of ordinary negligence. The district court then remanded for the Board to redetermine sanctions in light of its memorandum opinion, directing the Board to file an itemized cost bill in accordance with LR 2–302 NMRA.

{8} After the Board entered an amended decision with revised sanctions and costs in the amount of $22,021.83, Riegger again appealed to the district court. The district court entered an order allowing costs of only $1,669.11. Following the Board's motion for reconsideration, the district court allowed an additional $253.95 in costs that Riegger had conceded. In all other respects, it denied the Board's motion to reconsider.

{9} In formulating its ruling, the district court found that the term "costs" in Section 61–1–4(G) of the ULA should be construed to mean only the costs anticipated by Rule 1–054(D). It relied upon several out-of-state cases for this position. The district court also articulated additional reasons for rejecting certain costs. It reasoned that assessing the cost of the hearing officer would chill the licensee from defending against the charges. It also found that the Board members' per diem and mileage were provided for in another statute and that assessing the cost of the hearing room was contrary to the accessability and smooth functioning of the judiciary. The district court's final order incorporated its earlier memorandum opinions and allowed costs of $1,923.06. The Board filed a petition for certiorari which this Court granted.

## II. DISCUSSION

### A. Liability for Ordinary Negligent Acts Committed During a Single Episode of Treatment

{10} The ULA sets out the procedures for a professional board to take action

against a licensee. Section 61–14–13(A)(5) of the VPA authorizes the Board to discipline a licensee upon finding that the licensee "is guilty of dishonesty, incompetence, gross negligence or other malpractice in the practice of veterinary medicine." The Board claims that the definition of "other malpractice" includes Riegger's acts of ordinary negligence. This issue is a question of statutory interpretation that does not implicate agency expertise; our review is de novo. *See Hovet v. Allstate Ins. Co.*, 2004–NMSC–010, ¶ 10, 135 N.M. 397, 89 P.3d 69 (holding that the appellate courts apply a de novo standard of review to issues of statutory interpretation); *Rio Grande Chapter of the Sierra Club v. N.M. Mining Comm'n*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806 (stating that our Supreme Court would not defer to an agency's interpretation of a statute because this was a question of law that the Court reviews de novo); *Miss. Potash, Inc. v. Lemon*, 2003–NMCA–014, ¶ 7, 133 N.M. 128, 61 P.3d 837 (observing that "[w]e may substitute our interpretation of the law for that of the agency because it is a court's role to interpret the law"). Section 61–14–13(A)(5), as written, allows sanctioning for "gross negligence." As discussed later in this opinion, we hold that this standard alone defines the applicable standard of negligence upon which the Board can base its discipline of licensees; the phrase "other malpractice" in Section 61–14–13(A)(5) should not be interpreted to include a single episode of ordinary negligence. We specifically decline to address whether repeated acts of ordinary negligence over time may be disciplined as "other malpractice." We limit the scope of this opinion to a veterinarian's acts of ordinary negligence committed during a single episode of treatment.

{11} To interpret the phrase "other malpractice" as meaning a single episode of "negligence" would make the term "gross" mere surplusage. Reading a standard sanctioning a single act of ordinary negligence into the statute would expand the sanctionable behavior to allow discipline for all forms of negligence, *including* "gross negligence." The existing standard of "gross negligence" would thus be superfluous, and we will not interpret the statute in such a manner. *See*

*Regents of the Univ. of N.M. v. N.M. Fed'n of Teachers*, 1998–NMSC–020, ¶ 28, 125 N.M. 401, 962 P.2d 1236 ("Statutes must be construed so that no part of the statute is rendered surplusage or superfluous." (internal quotation marks and citation omitted)); *Slygh v. RMCI, Inc.*, 120 N.M. 358, 359, 901 P.2d 776, 777 (Ct.App.1995) ("A statute must be construed so that no word, clause, sentence, provision or part is rendered surplusage or superfluous."). If the legislature had intended to authorize sanctions for ordinary negligence, it could easily have drafted the statute to specifically include "negligence" without qualifying that term by adding of the word "gross." *Cf.* Colo.Rev.Stat. § 12–64–111(1)(k) (2004) (allowing veterinarians to be disciplined for "[i]ncompetence, negligence, or other malpractice"). Therefore, it would be unreasonable for the legislature to have intended the phrase "other malpractice" to encompass negligent acts committed during a single episode of treatment.

{12} The Board cites to the Medical Malpractice Act, NMSA 1978, §§ 41–5–1 to –29 (1976, as amended through 1997), and *Duncan v. Campbell*, 1997–NMCA–028, 123 N.M. 181, 936 P.2d 863, to support its claim that malpractice of a licensee should be interpreted as ordinary negligence. This argument is unpersuasive. Both the Medical Malpractice Act and this Court's decision in *Duncan* address the issue of when a practitioner may be civilly liable to a patient or client for malpractice and the possible limitations on this liability. *See* §§ 41–5–5, –6 (limiting the recovery available against qualified health care providers in civil malpractice actions); *Duncan*, 1997–NMCA–028, ¶¶ 1, 6, 11, 123 N.M. 181, 936 P.2d 863 (addressing when the plaintiff's legal malpractice claim accrued for purposes of the statute of limitations). *Duncan* does not discuss the meaning of "other malpractice" in the context of a standard for discipline of a licensee. *See Seeds v. Lucero*, 2005–NMCA–067, ¶ 19, 137 N.M. 589, 113 P.3d 859 (noting that a case was not authority for a proposition the case did not consider). *Duncan* instead discussed the civil statute of limitations as applied to a legal malpractice claim. 1997–NMCA–028, ¶ 1, 123 N.M. 181, 936

P.2d 863. *Duncan* has little bearing on the issues involved in the case before us.

{13} The Medical Malpractice Act further highlights the difference between disciplinary actions and tort or contract claims. This act's purposes are centered around the imposition of tort or contract liability as opposed to the discipline of a medical practitioner. *See* § 41–5–3(C) (stating that a malpractice claim "includes any *cause of action* arising in this state against a health care provider for medical treatment, lack of medical treatment or other claimed departure from accepted standards of health care which proximately results in injury to the patient, whether the patient's *claim* or *cause of action* sounds in tort or contract, and includes but is not limited to actions based on battery or wrongful death" (emphasis added)); *Wilschinsky v. Medina*, 108 N.M. 511, 516, 775 P.2d 713, 718 (1989) ("The New Mexico Medical Malpractice Act was enacted by the legislature in order to meet an insurance crisis, to promote health care in New Mexico by providing a framework for tort liability with which the insurance industry could operate."). We decline to apply the meaning of "malpractice" as that term is used in the context of civil tort liability to a case of sanctions imposed on a licensee by an administrative body. An examination of the Medical Malpractice Act convinces us that the inclusion of "negligence" in the matters addressed by the Medical Malpractice Act is consistent with a much different regulatory scheme than exists in the VPA.

{14} Looking in the other direction, the VPA creates and governs the Board and its oversight of veterinary licensing and discipline. *See, e.g.,* §§ 61–14–4, –8, –13. In scope and application, there is a chasm between the VPA and the Medical Malpractice Act. Because the purposes of the Medical Malpractice Act and the VPA are different, we do not believe that the VPA's reference to "other malpractice" in the context of disciplining a licensee can be equated with the word "malpractice" in the context of a civil cause of action under the Medical Malpractice Act. *See, e.g.,* § 41–5–3(C) (stating that malpractice claims include those sounding in tort and contract). In this case, the Board's purview is limited to its relationship to its licensee. The Board cannot provide relief as is available for malpractice as that term is used under the Medical Malpractice Act.

{15} Policy considerations also suggest that the legislature did not intend to authorize sanctions against a licensee for ordinary negligence committed during a single episode of treatment. Review of other statutes addressing the licensing and sanctioning of health care providers indicates that the legislature requires more to warrant discipline. We note that none of the other statutes concerning healthcare provider licensing authorize the discipline of a practitioner/licensee for an act of ordinary negligence. *See, e.g.,* NMSA 1978, § 61–3–28(A)(3) (2003) (providing that nurses may be disciplined if they are unfit or incompetent); NMSA 1978, § 61–4–10(A)(3), (A)(16)(f), (A)(16)(i) (1993) (providing that chiropractors may be disciplined for incompetence, gross negligence, or "repeated similar negligent acts"); NMSA 1978, § 61–5A–21(A)(3) (2003) (providing that dentists may be disciplined for "gross incompetence or gross negligence"); NMSA 1978, § 61–6–15(D)(12), (13), (19) (2005) (providing that medical doctors may be disciplined for gross negligence, manifest incapacity, incompetence, or "repeated similar negligent acts"); NMSA 1978, § 61–7A–13(A)(4) (1989) (providing that dieticians and nutritionists may be disciplined for conduct that is "grossly negligent or incompetent"); NMSA 1978, § 61–8–11(G) (1998) (providing that podiatrists may be disciplined for "gross malpractice or incompetency"); NMSA 1978, § 61–9A–26(A)(7), (9) (2005) (providing that mental health counselors may be disciplined for gross negligence and marked incompetence); NMSA 1978, § 61–10–15(C) (1975) (stating that osteopaths may be disciplined for gross malpractice). *But see* NMSA 1978, § 61–2–13(B) (1973) (stating that optometrists may be disciplined for "malpractice or incompetence"). We are not aware of any policy considerations that would support imposing a higher standard on veterinarians, who treat animals, than what is statutorily imposed on medical professionals treating people.

{16} That neither the hearing officer nor the district court has given effect, nor at-

tempted to assign a meaning, to the term "malpractice" does not require this Court to do so. We disagree with the Board's contention that the only reasonable construction of "other malpractice" is ordinary "negligence." As we have already stated, such an interpretation would render the phrase "gross negligence" superfluous. Even though the phrase "other malpractice" must authorize the Board to sanction a licensee for something in addition to gross negligence and incompetence, this case does not require us to define the entire scope of the behavior this phrase encompasses. Rather, we only decide that "other malpractice" does not include acts of ordinary negligence committed during a single episode of treatment. Perhaps the hearing officer correctly opined that "other malpractice" refers to issues such as the failure to obtain informed consent or inadequate supervision of other employees. It is possible that repeated negligent acts may be disciplined as "other malpractice." Perhaps not. Such questions are not before this Court. *See City of Las Cruces v. El Paso Elec. Co.*, 1998–NMSC–006, ¶ 18, 124 N.M. 640, 954 P.2d 72 ("We avoid rendering advisory opinions.").

{17} In this case, we interpret Section 61–14–13(A)(5) as excluding acts of ordinary negligence in order to avoid the unreasonable result of imposing a higher standard on veterinarians than the standard statutorily imposed upon other health care professionals and to avoid rendering the phrase "gross negligence" surplusage and superfluous. *See Regents of the Univ. of N.M.*, 1998–NMSC–020, ¶ 28, 125 N.M. 401, 962 P.2d 1236; *see also Wilson v. Mass. Mut. Life Ins. Co.*, 2004–NMCA–051, ¶ 27, 135 N.M. 506, 90 P.3d 525 ("We do not blindly assume that statutes are written with the precision that judges may prefer. Rather, we will interpret statutes to avoid unreasonable results." (citation omitted)).

**B. Liability for the Costs of the Administrative Proceeding**

**1. Rule 1–054(D) Does Not Limit Costs Under Section 61–1–4(G)**

{18} Like the previous issue, the statutory interpretation of "costs" under Section 61–1–

4(G) is a question of law which does not implicate agency expertise, so that our review is de novo. *See Rio Grande Chapter of the Sierra Club*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806. The district court reduced the Board's assessment of costs for the administrative proceeding against Riegger from $22,021.83 down to only $1,923.06. It reasoned that the term "costs" in Section 61–1–4(G) meant only the costs allowed by the rules of civil procedure. *See* Rule 1–054(D). The Board claims this reasoning was erroneous, and we agree.

{19} This Court has stated that Rule 1–054(D) "by its own terms does not apply when a statute expressly provides for an award of costs." *Paternoster v. La Cuesta Cabinets, Inc.*, 101 N.M. 773, 782, 689 P.2d 289, 298 (Ct.App.1984), *limited on other grounds by Apex Lines, Inc. v. Lopez*, 112 N.M. 309, 815 P.2d 162 (Ct.App.1991). Rule 1–054(D)(1) states that a prevailing party will be allowed its costs "[e]xcept when express provision therefor is made . . . in a statute." Section 61–1–4(G) is such a statute, expressly providing for costs by stating that a licensee "shall bear *all costs* of disciplinary proceedings." (Emphasis added.) We hold that under the plain language of Rule 1–054(D), this rule does not govern an award of costs in an administrative disciplinary action under the ULA. We reverse the district court on this point.

{20} Unpersuaded that Rule 1–054(D) applies directly to this case, we are equally unpersuaded that this rule applies indirectly. Riegger argues that when the legislature said "costs" in Section 61–1–4(G), it was using this term as shorthand for costs permissible under the rules of civil procedure. However, this language is not in Section 61–1–4(G), and we do not add language to a statute when it makes sense as it is written. *See Santa Fe County Bd. of County Comm'rs v. Town of Edgewood*, 2004–NMCA–111, ¶ 7, 136 N.M. 301, 97 P.3d 633. The legislature, had it wished, could have made the costs subject to the rules of civil procedure, as it did in other sections of the ULA. *See, e.g.*, §§ 61–1–5 (stating that the method of service under the ULA shall be in the same manner as under the rules of civil

procedure), –9(B) (same), –8(C) (stating that depositions taken under the ULA are to be in accordance with the rules of civil procedure), –19 (stating that motions to stay may be filed under the ULA in accordance with the rules of civil procedure). This principle was acknowledged in *Sears v. Romer,* 928 P.2d 745, 750 (Colo.Ct.App.1996), where the Colorado Court of Appeals held that since the "costs [were] imposed in a regulatory matter under an administrative scheme that contains no reference to [the civil costs statute] ... examples of 'costs' recoverable in civil actions" were not determinative of the agency cost assessment under review.

{21} The briefs indicate why the statute, in allowing "all costs" in an administrative disciplinary proceeding of a licensee, makes sense as written. The district courts are not funded in the same way as an administrative board. In district court, the State funds the cost of the judge, support staff, and courthouse. The same costs are incurred in an administrative proceeding but without a state funding mechanism. *See* § 61–14–4(E) (stating that reimbursement for the Board's expenses "and all other expenses involved in carrying out the [VPA] shall be paid exclusively from fees received pursuant to provisions of the [VPA]"). Those disciplined by an administrative board therefore bear the cost of their own discipline since the State does not.

{22} We acknowledge that in some circumstances, Rule 1–054(D) may guide a district court's review of an agency's cost assessment. For example, the Nevada Supreme Court in *Gilman v. Nevada State Board of Veterinary Medical Examiners,* 120 Nev. 263, 89 P.3d 1000, 1006 (2004), described its civil costs statute as "illustrat[ive]." *Gilman* stated that its civil costs statute "provides guidance for the recovery of costs, regardless of whether the parties are in district court or before an administrative board." *Id.* We do not interpret these statements to hold that the civil costs statute directly applied to an administrative agency's cost assessment. Rather, we interpret these statements to mean that, in reviewing an agency's assessment of costs, the district court may look to a civil costs statute for guidance. We see nothing inappropriate in a district court looking to Rule 1–054(D) for guidance in reviewing an agency's cost assessment to determine whether the agency "acted fraudulently, arbitrarily or capriciously," without substantial evidence, or contrary to law. *See N.M. State Bd. of Psychologist Exam'rs v. Land,* 2003–NMCA–034, ¶ 5, 133 N.M. 362, 62 P.3d 1244.

{23} However, we are unpersuaded by the reliance Riegger and the district court placed upon language contained in *In re Wang,* 441 N.W.2d 488 (Minn.1989), and *Devous v. Wyoming State Board of Medical Examiners,* 845 P.2d 408 (Wyo.1993). In *Wang,* the provision at issue stated that the board could require the licensee to pay all of its costs if the licensee had his or her license revoked or suspended. 441 N.W.2d at 496. *Wang* reasoned that, because attorney fees and investigation costs were not specifically authorized by the statute, and because of policy reasons implicating due process concerns, those costs were not recoverable. *Id.* In this case, attorney fees and investigation costs are not at issue, and we are remanding for consideration of the constitutional question. As to the remaining costs, *Wang* then stated that its civil costs statute evinced a legislative intent that the civil costs statute should govern the agency's cost assessment. *Id.* at 497. As explained above, we do not agree with this analysis.

{24} In *Devous,* the provision at issue stated that the board could take a number of punitive actions against a licensee, including assessing all or part of the cost of the proceedings. 845 P.2d at 418–19; *see* Wyo. Stat. Ann. § 33–26–405(a)(viii) (2003). *Devous* reasoned that because of the general rule that parties to litigation bear their own expenses, and because none of its cases had ever held that "costs" included attorney fees and the expenses of the hearing examiner, those expenses were not recoverable. 845 P.2d at 418–19. We find this analysis less than compelling.

{25} In addition to our disagreement with the analysis in these cases, Section 61–1–4(G), unlike the provisions in *Devous* and *Wang,* sets a different tone. Section 61–1–4(G) uses mandatory language: a licensee who does not prevail on the merits "*shall*

bear *all costs* of disciplinary proceedings." (Emphasis added.) The costs must be paid unless the Board excuses the licensee from paying or the licensee prevails *and* no other sanction is given. *Id.* This mandatory language reaffirms our holding that Rule 1–054(D) does not dictate costs under Section 61–1–4(G).

{26} The district court disallowed several costs solely upon its Rule 1–054(D) rationale. First, it excluded the cost of the hearing room, citing Rule 1–054(D) and the dissenting opinion in a Colorado Court of Appeals case. *See Sears*, 928 P.2d at 752–53 (Rothenberg, J., concurring in part, dissenting in part) (disagreeing with the majority that an administrative cost award is not governed by the civil costs statute). We have held that the costs in this case are not governed by Rule 1–054, and we consider the majority opinion in *Sears* the better authority than its dissent. The disallowance of the cost of the hearing room must be reversed.

{27} Next, the district court ruled that the Board could not recover the fees and expenses for one of its expert witnesses, Dr. Martinez. The district court primarily relied upon Rule 1–054(D)(2)(g), which limits expert witness fees as set forth in NMSA 1978, § 38–6–4(B) (1983) (limiting expert witness fees "in any civil case pending in the district court" to one expert for liability and one for damages unless the district court "finds that additional expert testimony was reasonably necessary to the prevailing party and the expert testimony was not cumulative"). The district court thus found that Dr. Martinez's testimony was cumulative. As explained later in this opinion, the question was whether the costs associated with Dr. Martinez were arbitrary and capricious. *See Land*, 2003–NMCA–034, ¶ 5, 133 N.M. 362, 62 P.3d 1244; *see also* NMSA 1978, § 39–3–1.1(D)(1) (1999) ("[T]he district court may set aside . . . the final decision if it determines that . . . the agency acted fraudulently, arbitrarily or capriciously[.]"); Rule 1–074(Q)(1) (same). We have already held that Rule 1–054(D) does not limit the costs permissible under Section 61–1–4(G). We therefore also reverse the disallowance of the costs associated with Dr. Martinez. We remand for the district court

to reconsider the cost assessment under the appropriate standard of review. *See Land*, 2003–NMCA–034, ¶ 5, 133 N.M. 362, 62 P.3d 1244 (stating that a court may reverse an agency's action where the agency "acted fraudulently, arbitrarily or capriciously," without substantial evidence, or contrary to law).

{28} Since the district court provided reasons other than Rule 1–054(D) for its disallowance of several other costs, we address each of those costs in turn except for the cost of the hearing officer. As for the cost of the hearing officer, the district court stated that the Board could not assess this cost under Rule 1–054(D). However, the district court also stated that to charge the licensee with this cost would have a chilling effect upon a licensee's right to challenge the charges against him or her while giving the Board an incentive to pass its costs through to the licensee. The district court then stated that it did not "reach this particular constitutional question." We do not address whether this rationale was incorrect because the Board has declined to brief this issue on the belief that the district court did not reach it. While it is true that this Court will affirm the district court's decision if it is right for any reason, we will not do so where this would be unfair to the appellant. *See Meiboom v. Watson*, 2000–NMSC–004, ¶ 20, 128 N.M. 536, 994 P.2d 1154. Considering that the district court posited the chilling effect as a rationale, then stated that it was not reaching this constitutional question, we may in fairness neither address this issue nor use it as a basis to affirm this cost. *See id.* Therefore, the disallowance of this cost of the hearing officer is reversed solely upon the district court's erroneous reliance upon Rule 1–054(D). We remand for the district court to consider the constitutional question in light of *Gilman*, 89 P.3d at 1003–05.

{29} Having explained that the costs a licensee may be assessed under Section 61–1–4(G) are not limited by Rule 1–054(D), we are faced with those limits that Riegger asks us to impose and other limitations the district court placed on the cost award in this case. We address each in turn.

{30} Riegger argues that the legislature did not intend for the "unfettered and un-reviewable" assessment of costs against a licensee. Riegger also argues that the district court properly limited the costs in this case because in addressing attorney discipline cases, our Supreme Court has frequently assessed "costs" that are much lower than those involved here. We agree that there are limits on the costs a disciplinary board can assess against a licensee. These limits are not, however, contained in the rules of civil procedure or other, more specific disciplinary rules. Rather, costs are limited by the district court's review. The district court will reverse an assessment of costs if "it determines that the agency acted fraudulently, arbitrarily or capriciously, if the decision was not supported by substantial evidence, or if the agency did not act in accordance with the law." *See Land*, 2003–NMCA–034, ¶ 5, 133 N.M. 362, 62 P.3d 1244; § 39–3–1.1(D)(1); Rule 1–074(Q)(1). This standard limits the costs available under Section 61–1–4(G), so that a cost assessment is neither "unfettered" nor limited by vague notions that it should be lower. Rather, under this standard, "[t]he district court may not substitute its judgment for that of the agency and must evaluate whether the record supports the result reached, not whether a different result could have been reached." *Land*, 2003–NMCA–034, ¶ 5, 133 N.M. 362, 62 P.3d 1244; *see Gonzales v. N.M. Bd. of Chiropractic Exam'rs*, 1998–NMSC–021, ¶ 12, 125 N.M. 418, 962 P.2d 1253 (stating that, by granting to professional boards the power over licenses and discipline, "[t]he Legislature provided for a certain level of internal self-regulation, subject to limited judicial review").

### 2. The Board's Decision to Use a Stenographer Instead of a Tape Recorder Was Not Arbitrary and Capricious

{31} The Board sought to assess Riegger $6,909.56 for transcription of his September 2002 hearing on the merits of the disciplinary action. The district court excluded the cost of this transcription because "[t]he Board chose its method (a stenographer, instead of tape recording) and the licensee should not bear the cost of the Board's expensive decision." Our question is whether the mere expense of transcription was arbitrary and capricious. *See Land*, 2003–NMCA–034, ¶ 5, 133 N.M. 362, 62 P.3d 1244. We hold that it was not.

{32} Section 61–1–12 of the ULA requires that a record of the hearing be preserved. Preservation may be "by any stenographic method in use in the district courts of this state, or in the discretion of the [B]oard, by tape recording." The Board was therefore allowed to employ a stenographer at the hearing, which lasted five days. The Board members had to familiarize themselves with the evidence before they could make a decision. *See* § 61–1–13(A). This decision had to be rendered within ninety days of the hearing. *See* § 61–1–13(B). The Board was therefore faced with making a reasoned but expeditious decision based on a very long hearing involving specialized issues. Transcription of the stenographic record was therefore a logical choice. Furthermore, this cost would have been allowable even if the stricter Rule 1–054(D) standards were applicable. *See* Rule 1–054(D)(2)(d). Because employing a stenographer was a permissible and logical choice, assessing the cost was not arbitrary or capricious. *See Colonias Dev. Council v. Rhino Envtl. Servs., Inc.*, 2005–NMSC–024, ¶ 13, 138 N.M. 133, 117 P.3d 939 (stating that a decision of an administrative agency will be held to be arbitrary and capricious if, in light of the whole record, the decision is unreasonable or without a rational basis); *Perkins v. Dep't of Human Servs.*, 106 N.M. 651, 655, 748 P.2d 24, 28 (Ct.App. 1987) ("Where there is room for two opinions, the action is not arbitrary or capricious if exercised honestly and upon due consideration, even though another conclusion might have been reached."). Rather, the district court's decision that the cost of the stenographic transcription was just too expensive appears to stray from its required standard of review into fact-finding. *See Land*, 2003–NMCA–034, ¶ 5, 133 N.M. 362, 62 P.3d 1244. We reverse the district court's exclusion of the cost of the stenographic transcription.

### 3. The Board Members' Per Diem and Mileage Is Not a Permissible Cost

{33} This subsection of the opinion represents the dissenting view of the author.

Judge Pickard's opinion, joined by Judge Sutin, represents the majority opinion on whether the district court properly disallowed the cost of the Board members' per diem and mileage.

{34} "Costs are a creature of statutes and may not be imposed in the absence of clear legislative authorization." *Mathis v. Trailways Lines, Inc.*, 111 N.M. 292, 294, 804 P.2d 1111, 1113 (Ct.App.1990) (internal quotation marks and citations omitted). Our courts demonstrate a reluctance to expand allowable costs beyond what is provided for by statute and precedent. *Key v. Chrysler Motors Co.*, 2000–NMSC–010, ¶ 19, 128 N.M. 739, 998 P.2d 575. Costs are not expenses in general, but only those that are recoverable. Generally, "the term 'costs' refers specifically to those items of expense incurred in litigation that a prevailing party is allowed by rule to tax against the losing party." 20 Am.Jur.2d *Costs* § 1 (2005). I believe that the majority allows an award of per diem costs to the Board by expansively divining the intent of the legislature in the give and take between the VPA and its incorporation of the ULA to include an expense that should not be taxed to Riegger. This primarily stems from what we might now see as an unfortunate bit of drafting that uses both the words "fees" and "costs" in Section 61–1–4(G). While I concede that for the purpose of Section 61–1–4, they mean the same thing, I think conflating them under the word "cost" is more useful, as I consider it improbable that "fee" in that section of the ULA means the same thing as it does in the VPA. The majority's use of the word "fee" makes it too easy to make unwarranted assumptions about "fees" under the ULA when "costs" provides a semantic distinction that becomes essential. Because the VPA specifies per diem is generally paid from license fees and Riegger has presumably paid them, the majority's position should entitle Riegger to a set-off or rebate against assessed costs. On the other side, I see nothing to prohibit the Board from calculating any pro-rata share of "costs" to assess— from light bills to bottled water drunk by Board members at a hearing if the majority have their way. I think the VPA says per diem comes from licensing fees, and is not a proper component of assessed costs.

{35} This is a question of statutory interpretation not involving an agency's expertise that is reviewed de novo. *See Rio Grande Chapter of the Sierra Club*, 2003–NMSC–005, ¶ 17, 133 N.M. 97, 61 P.3d 806. The district court rejected the cost of the Board members' per diem and mileage based on Rule 1–054(D) "and because their payment is authorized elsewhere" by Section 61–14–4(E). Section 61–14–4(E) provides for the way the Board members are paid per diem and mileage, and says that they are paid "exclusively from fees received pursuant to provisions of the Veterinary Practice Act." "The purpose of the Per Diem and Mileage Act ... is to establish rates for reimbursement for travel for public officers and employees." NMSA 1978, § 10–8–2 (1971). Nothing in the Per Diem and Mileage Act specifies the source from which the Board members are to receive compensation for this cost. Section 61–14–4(E) thus designates the *exclusive source* of the funds from which Board members may be paid for per diem and mileage. This language does not explicitly prohibit per diem and mileage from being assessed as "costs" under Section 61–1–4(G), but appears to preclude the Board from drawing on the assessed costs as a source of reimbursement. Section 61–14–4 is a statute that creates the Board of Veterinary Medicine and says how they will go about their work. It allows per diem and mileage for Board members as they exercise their lawful authority. NMSA 1978, § 61–14–5(A) (1999), establishes one of those purposes as determining the qualifications and fitness of veterinarians, and "issue, renew, deny, suspend or revoke licenses." Section 61–14–5(C) empowers the Board to "establish a schedule of license and permit fees based on the board's financial requirements for the ensuing year."

{36} In civil litigation, we have held that litigants are not to bear the "burden of paying per diem and travel expenses incurred by a district judge and his court reporter." *Read v. W. Farm Bureau Mut. Ins. Co.*, 90 N.M. 369, 375, 563 P.2d 1162, 1168 (Ct.App. 1977). *Read* cites to the predecessor of current NMSA 1978, § 34–6–23 (1968), that provides that district judges and district court employees' per diem "shall be paid from the

funds of the district court of the judicial district for which the business is transacted." This conclusion appears to stem from the source of funding for such proceedings. In *In re Nelson,* 207 Ariz. 318, 86 P.3d 374 (2004) (en banc), the Arizona Supreme Court held that per diem, mileage, and lodging for a hearing panel were not assessable costs. *Id.* at 380. *Nelson* pointed out that "[a] disciplinary hearing panel's function is similar to that of a judge conducting a bench trial." *Id.*

{37} The Board's official functions as defined by statute include conducting disciplinary matters. In pursuit of their functions, their per diem is paid by the fees they assess, which are likewise limited by statute to those assessed against licensees in general. According to Section 61–14–5(C), if the Board's expenses increase, they can increase their fees to cover operating expenses, including their per diem to attend disciplinary hearings. Paying per diem by reading "fees" to include costs of disciplinary proceedings exceeds the "fees" allowed the Board under statute. The ULA is incorporated into the VPA, but the VPA is specific about the source of per diem. The VPA deals with the Board, its functions, and its funding specifically. Because the Board's functions are funded by fees defined by statute, turning "costs" into "fees" under the ULA should not control the more specific provisions of VPA Section 61–14–5(C) that authorizes only license and permit fees, and Section 61–14–4(E) that says Board members pursuing their duties are paid per diem from those fees received from all licensees. Disciplinary proceedings are part of the regular, ordinary business of the Board, just as going to court is for judges and court reporters. Travel costs might be expenses, but they should not be costs when otherwise provided for by statute.

{38} Taking the majority's more expansive reading leads to absurd consequences. Since Riegger may have paid his license fee, he is being asked by the Board to pay twice for the per diem expense. Is he now entitled to a rebate on a flat or pro-rata basis? Upon remand, I hope the district court might address the question if it arises. If operating expenses otherwise covered by statute that are incident to ordinary Board business (such as per diem) can be taxed as costs to the disciplined veterinarian, there is nothing to prevent other ordinary expenses also being so taxed. Space rental, telephone bills, water bills, and other components of the overhead required to carry on the business of the Board might be broken out and assessed. When our Supreme Court suggests that trial courts "carefully, cautiously, and sparingly exercise their discretion when considering expenses not authorized by statute or precedent," there is no reason for us to allow an administrative agency more latitude. *See Key,* 2000–NMSC–010, ¶ 19, 128 N.M. 739, 998 P.2d 575 (internal quotation marks and citation omitted). This is particularly so when, as here, a statute stands to demarcate per diem as an expense that should not be taxed here as a cost. The district court's skeptical conservatism in this regard is commendable. The Board is funded only by its members and disciplined licensees, and can increase fees if expenses (like more disciplinary hearings) increase. When the legislature excluded disciplined licensees as a source of reimbursement for per diem and mileage, this exclusion expressed a decision that funds for per diem and mileage were *not* to come from disciplined licensees. I would therefore hold that under Section 61–1–4(G), per diem and mileage are not recoverable costs. I would affirm the district court's disallowance of these expenses. *See Meiboom,* 2000–NMSC–004, ¶ 20, 128 N.M. 536, 994 P.2d 1154. The majority has expressed a different view and this holding is set forth below. For the reasons above, I dissent.

## III.  CONCLUSION

{39} We affirm the district court's conclusion that Riegger's acts of ordinary negligence were not subject to discipline under Section 61–14–13(A)(5) of the VPA. We reverse the district court's disallowance of the costs of the hearing room, the expert witness, and the hearing officer because Rule 1–054(D) does not limit the costs available under Section 61–1–4(G) of the ULA. We remand for the district court to reevaluate these costs under the appropriate standard of review for agency decisions. We reverse

the disallowance of the cost of the stenographic transcription because this cost was not arbitrary or capricious. We also reverse the district court's exclusion of per diem and mileage, although the author would affirm as explained above. Upon remand, the district court may also consider the constitutional question which it did not reach earlier.

{40} **IT IS SO ORDERED.**

LYNN PICKARD and JONATHAN B. SUTIN (concurring in part).

PICKARD, Judge.

■ {41} We concur in all of Judge Kennedy's opinion with the exception of the discussion of the Board's per diem and mileage. This opinion represents the majority opinion on the issue of the Board members' per diem and mileage. As we understand the dissent's discussion of this issue, it is that the legislature did not intend a recovery of costs to pay Board members' per diem and mileage to attend disciplinary hearings, because their per diem and mileage is intended to be paid from the license fees of all veterinarians regulated by the Board. Opinion, ¶¶ 33–38. We cannot agree, either as a legal matter or a practical matter.

{42} As a legal matter, we agree with the dissent that two of the pertinent, governing statutes are Section 61–14–4(E) of the VPA and Section 61–1–4(G) of the ULA. Section 61–14–4(E) states:

> Members of the board shall receive per diem and mileage as provided in the Per Diem and Mileage Act . . . and shall receive no other compensation, perquisite or allowance. *This reimbursement and all other expenses involved in carrying out the Veterinary Practice Act . . . shall be paid exclusively from fees received pursuant to provisions of the Veterinary Practice Act.* The board shall deposit all fees received pursuant to provisions of the Veterinary Practice Act with the state treasurer for the exclusive use of the board, and money shall be expended only upon vouchers certified by a majority of the board.

*Id.* (emphasis added). Section 61–1–4(G) states: "Licensees shall bear all costs of

disciplinary proceedings unless they are excused by the board from paying all or part of the *fees* or if they prevail at the hearing. . . ." (Emphasis added.) However, Section 61–14–13(A) of the VPA incorporates the ULA into the VPA when it authorizes disciplinary action to be taken against licensees "[i]n accordance with the procedures contained in the [ULA]."

{43} It can be seen from this statutory framework that among the "fees" received pursuant to the VPA are the "fees" designated as "costs" collected pursuant to the ULA. Because the word "fees" is used both in the ULA and in the VPA, it appears to us that the legislature intended that the costs assessed in disciplinary proceedings may be considered fees received pursuant to the VPA.

{44} As a practical matter, we believe that this result is also well supported. The dissent appears to indicate that the Board members' per diem and mileage, whether for regular Board meetings or the extraordinary meetings concerned with disciplining members, should come from the members' regular fees, and not from the disciplined members' fees that are charged as costs. From a practical standpoint, it appears to us that the Board could well establish its regular schedule of fees pursuant to Section 61–14–5(C) based on its regularly anticipated duties of meeting in the ordinary course, holding examinations, and the like. *See* § 61–14–5 (establishing Board duties). Pursuant to this view, the extra meetings that are the result of unanticipated disciplinary proceedings are more appropriately charged to the disciplined veterinarian.

I CONCUR: JONATHAN B. SUTIN, Judge.