2006-NMCA-082

139 P.3d 209

**PICKETT RANCH, LLC, Appellant,**

v.

**Ron CURRY, Secretary of the New Mexico Environmental Department, Appellee.**

**No. 25,888.**

Court of Appeals of New Mexico.

July 5, 2006.

**52**

Rodey, Dickason, Sloan, Akin & Robb, P.A., Mark K. Adams, Edward Ricco, Michelle Henrie, Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, J. Brent Moore, Assistant General Counsel, Special Assistant Attorney General, NM Environment Department, Santa Fe, NM, for Appellee.

## OPINION

PICKARD, Judge.

{1} In this case, we interpret regulations promulgated by the New Mexico Environment Department (the Department) governing what a municipality must show regarding its financial capacity in order to obtain a permit for a new landfill. We determine that the relevant regulations were satisfied in this case. Because we also determine that the Secretary of the Department did not abuse his discretion or act arbitrarily or capriciously and that his findings are supported by substantial evidence, we affirm the final order granting the permit.

## BACKGROUND

{2} In 2001, the City of Tucumcari submitted to the Department an application for a permit to open a new landfill. In accordance with the Solid Waste Act, NMSA 1978, §§ 74-9-1 to -43 (1990, as amended through 2001) (the Act), the Department held a public hearing. Appellant in this case is a landowner whose land abuts the proposed landfill site. Appellant, through counsel, appeared at the hearing and presented evidence and expert testimony in opposition to the application. After the hearing, the hearing officer issued a detailed report, recommending that the permit be granted with certain conditions. The Secretary of the Department approved the report and issued a final order granting the permit. Appellant appeals the Secretary's final order pursuant to Section 74-9-30. Appellant contends that the permit should not have been granted because Tucumcari failed to comply with certain statutory and regulatory requirements involving financial assurance, because some of the Secretary's findings are not supported by substantial evidence, and because the Secretary abused his discretion and acted arbitrarily and capriciously.

## DISCUSSION

{3} Appellant's arguments fall into two categories. First, Appellant argues that the permit should not have been granted because Tucumcari failed to demonstrate that it met the financial assurance requirements of the Act and the relevant regulations. Second, Appellant challenges several of the Secretary's factual findings, arguing that they are either arbitrary and capricious or not supported by substantial evidence. Appellant's contention appears to be that, in light of Tucumcari's poor history of compliance with the regulations at its existing landfill, the Secretary granted the permit for the new landfill without doing enough to ensure that adequate safeguards were in place to protect the public health and welfare. Appellant argues a third issue involving the regionalization scheme set forth in the Act. We do not reach this issue, as it was not raised before the hearing officer. *See* Rule 12-216(A) NMRA.

## 1. Financial Assurance Requirements

{4} The hearing officer found that Tucumcari was not required to satisfy certain aspects of the regulations governing financial assurance in order to obtain a permit. Rather, the officer concluded that the regulatory scheme allowed the Department to issue the permit to Tucumcari and then require the City to demonstrate that it was in compliance prior to the initial receipt of waste at the facility. The officer recommended that the Secretary impose a condition slightly more stringent than what was required by the regulations: she recommended that Tucumcari be required to demonstrate the necessary financial compliance before beginning construction, rather than before the initial receipt of waste. The Secretary approved the proposed condition.

{5} The crux of Appellant's argument is that Tucumcari was required to show compliance with all of the regulations governing financial assurance before it could get a permit and that the Department violated its own regulations by allowing Tucumcari to make such a showing after it had already obtained a permit. Because there are no facts in dispute, the question we must answer is whether the Act and the relevant regulations permit the Department to allow post-permit compliance, rather than pre-permit compliance, with some of the regulations governing financial assurance. Under the Act, we may set aside an action of the Department only if we find it to be "(1) arbitrary, capricious or an abuse of discretion; (2) not supported by substantial evidence in the record; or (3) otherwise not in accordance with law." Section 74–9–30(B). Our review of the relevant statutes and regulations is generally de novo, *State v. Collins*, 2005–NMCA–044, ¶ 23, 137 N.M. 353, 110 P.3d 1090, but we will accord deference to the Department's interpretation of its own ambiguous regulations, *Colonias Dev. Council v. Rhino Envtl. Servs. Inc.*, 2005–NMSC–024, ¶ 13, 138 N.M. 133, 117 P.3d 939. In reviewing for substantial evidence, we apply "whole record" review, meaning that we examine all of the evidence in the record, not just the evidence that supports the decision. *See At-lixco Coal. v. Maggiore*, 1998–NMCA–134, ¶ 23, 125 N.M. 786, 965 P.2d 370.

{6} We begin by setting forth the statutory and regulatory framework governing financial assurance. The Act directs the Department to promulgate regulations that are "designed to assure that there are adequate sources of funds to provide for" various occurrences, including eventual closure of facilities, monitoring of environmental hazards, and clean up or decontamination of facilities if such becomes necessary. Section 74–9–35(A). The Act states that such funds "shall be available during the operating life of the solid waste facility and for a post-closure period[.]" Section 74–9–35(B). The Act mentions various methods by which a facility operator may show that it has the financial resources necessary to eventually close the facility and to deal with problems that may arise during operation of the facility. Section 74–9–35(D). Finally, the Act states that the Secretary "may ... deny a permit application if the applicant fails to meet the financial responsibility requirements" established by the Department. Section 74–9–24(A).

{7} We next set forth the relevant Department regulations. The regulation that establishes the effective date of the financial assurance regulations, 20.9.1.900(A)(2) NMAC (1995) (citing 40 C.F.R. § 258.70 (2004)), states as follows:

The requirements of this Subpart [20.9.1.900 NMAC, governing financial assurance] are effective upon the earliest of:

(a) when an owner or operator seeks a permit;

(b) when an owner or operator seeks a permit to modify their facility;

(c) when the Secretary has requested a permit application; or

(d) when the date for compliance with financial assurance provisions established in 40 CFR [§ ]258.70, Subpart G—Financial Assurance Criteria, takes effect.

Subsection F of 20.9.1.900 NMAC sets forth eight ways in which an owner or operator of a landfill may demonstrate financial assurance. Subsection F states that an owner or operator must pick one of the eight methods. The method chosen by the City of Tucumcari

in this case was the "Local Government Financial Test," which is described in 20.9.1.900(F)(6)(a)-(e) NMAC. For the sake of clarity, we now set forth the relevant parts of that regulation in full:

(a) An owner or operator that satisfies the requirements of [20.9.1.900(F)(6)(b)-(d)] may demonstrate financial assurance up to the amount specified in [20.9.1.900(F)(6)(e)] for closure, post closure, the Phase I and Phase II assessment, and/or corrective action.

(b) Financial component:

(i) The owner or operator must satisfy one of the following: 1) if the owner or operator has outstanding general obligations bonds, it must have a current rating of Aaa, Aa, A, or Baa, as issued by Moody's, or AAA, AA, A, or BBB, as issued by Standard and Poor's on all outstanding general obligation bonds; or, 2) if the owner or operator does not have outstanding general obligation bonds, it must satisfy each of the following financial ratios: a ratio of cash plus marketable securities to total expenditures greater than or equal to 0.05; and a ratio of annual debt service to total expenditures less than or equal to 0.20; and a ratio of long-term debt issued and outstanding to capital expenditures less than or equal to 2.00.

(ii) The owner or operator must prepare its financial statements in conformity with Generally Accepted Accounting Principles for governments.

(iii) An owner or operator is not eligible to assure its obligations under this Subsection F [the Local Government Financial Test] if it: is currently in default on any outstanding general obligation bonds; has an outstanding general obligation bond[ ] rated lower than Baa as issued by Moody's or BBB as issued by Standard and Poor's; operated at a deficit equal to five percent or more of total annual revenue in either of the past two fiscal years; or receives an adverse opinion, disclaimer of opinion, or other qualified opinion from the independent certified public accountant (or appropriate State agency) auditing its financial statement as required under [20.9.1.900(F)(6)(b)(iii)]. However, the Secretary may evaluate qualified opinions on a case-by-case basis and allow use of the financial test in cases where the Secretary deems the qualification insufficient to warrant disallowance of the test.

. . . .

(d) Record keeping and reporting requiréments:

(i) The local government owner or operator must place the following items in the facility's operating record: [1] a letter signed by the local government's chief financial officer that: [a] lists all the current cost estimates covered by a financial test, as described in [20.9.1.900(F)(6)(c) NMAC]; [b] provides evidence and certifies that the local government meets the conditions of [20.9.1.900(F)(6)(b) and (c) NMAC]; and [c] certifies that the local government meets the conditions of [20.9.1.900(F)(6)(e) NMAC]; [2] the local government's independently audited year-end financial statements for the latest fiscal year, including the unqualified opinion of the auditor who must be an independent, certified public accountant or an appropriate State agency that conducts equivalent comprehensive audits; and [3] a report to the local government from the local government's independent certified public accountant or the appropriate State agency stating that: the certified public accountant or State agency has compared the data in the chief financial officer's letter with the owner's or operator's independently audited, year-end financial statements for the latest fiscal year; and in connection with that examination, no matters came to his attention which caused him to believe that the data in the chief financial officer's letter should be adjusted.

32(ii) the items required in [20.9.1.900(F)(6)(d)(i) NMAC] must be placed in the facility operating record as follows: in the case of closure, post-closure care, and the Phase I and Phase II assessment, either before the initial receipt of

waste at the facility or before the effective date of this Subpart [20.9.1.900], whichever is later[.]

. . . .

(v) A local government must satisfy the requirements of the financial test at the close of each fiscal year.

20.9.1.900(F)(6) NMAC.

{8} As noted above, Appellant's argument is that (1) Tucumcari needed to meet all of the requirements set forth in 20.9.1.900(F)(6) NMAC, and specifically the requirement of 20.9.1.900(F)(6)(d)(i) NMAC involving a year-end financial statement from the latest fiscal year, before it could get a permit, and (2) the Secretary erred in issuing the permit and allowing Tucumcari to demonstrate compliance with some of those requirements at a later date.

{9} Before setting forth Appellant's arguments in greater detail, we note that Appellant does not argue that the central financial assurance requirement was not satisfied in this case. As we stated above, the purpose of the regulations is to ensure that adequate funds are available for closure of facilities and for problems that may arise while the facility is in operation. 20.9.1.900(F)(6)(b)(i) NMAC, titled "Financial component," describes the substantive mechanisms through which a local government may show that it has adequate resources. The regulation states that the local government must show that either (1) it has been given a certain rating by Moody's or Standard and Poor's, or (2) it operates under certain ratios involving debts, expenditures, and assets. Tucumcari made the requisite showing in this case. Because 20.9.1.900(F)(6)(b)(i) NMAC sets forth the substantive requirements for showing financial assurance, we think it fair to conclude that 20.9.1.900(F)(6)(b)(i) NMAC is the central requirement of the local government financial test. As noted, Appellant makes no argument that Tucumcari failed to satisfy 20.9.1.900(F)(6)(b)(i) NMAC.

{10} We now examine Appellant's arguments regarding financial assurance in greater detail. We first note Appellant's argument that if Tucumcari did not meet the financial assurances requirements, the Secre-

tary was required to deny the permit. We are not convinced that this is true. 20.9.1.200(L)(12) NMAC (1995) states that the Secretary "shall" deny a permit application "if the applicant fails to meet the financial responsibility requirements." However, the Solid Waste Act states that the Secretary "may" deny a permit if the applicant has failed to satisfy the financial assurance requirements. Section 74–9–24(A). Where a statute and a regulation are inconsistent, the statute will prevail. *Jones v. Employment Servs. Div.,* 95 N.M. 97, 99, 619 P.2d 542, 544 (1980) ("If there is a conflict or inconsistency between statutes and regulations promulgated by an agency, the language of the statutes shall prevail."). In this case, we need not decide whether the statute and the regulation are truly inconsistent, such that the statute would trump the regulation and the Secretary would have discretion to grant the permit even if he found that the requirements were not satisfied. We determine that even if the Secretary was required to deny the permit on a finding that the financial assurance requirements were not satisfied, the Secretary did not err because Tucumcari adequately complied with the requirements in this case.

{11} In support of its contention that a permit applicant must demonstrate total compliance with all of the financial assurance requirements at the time the application is filed, Appellant first cites 20.9.1.900(A)(2) NMAC. As noted above, that regulation states that "[t]he requirements of [Subpart 900] are effective upon the earliest of": (1) "when an owner or operator seeks a permit"; (2) "when an owner or operator seeks a permit to modify their facility"; (3) "when the Secretary has requested a permit application"; or (4) "when the date for compliance with financial assurance provisions established in 40 CFR [§ ] 258.70, Subpart G— Financial Assurance Criteria, takes effect."

{12} Appellant appears to make a broad argument that the first category listed above, "when an owner or operator seeks a permit," dictates that, as soon as an applicant files a permit, the financial assurance requirements are "triggered," such that the applicant must comply with all of the requirements detailed

in Subpart 900. We reject this argument. Category (4) above refers to 40 C.F.R. § 258.70, Subpart G. Subsection (b) of that C.F.R. states that "[t]he requirements of this section are effective April 9, 1997[.]" Subpart 900 was promulgated in 1994, prior to the April 9, 1997, date referenced in the C.F.R. Accordingly, we see only one logical interpretation of 20.9.1.900(A)(2) NMAC: before April 9, 1997, owners or operators who sought a permit to open or modify a facility were subject to the financial assurance requirements, but owners or operators of existing facilities (as long as they did not seek a new permit) were not subject to the requirements; then, beginning on April 9, 1997, when the C.F.R. became effective, all owners and operators of facilities, both new and existing, became subject to the financial assurance requirements. We find our interpretation to be the only logical one because, after April 9, 1997, the "earliest" of the four options under 20.9.1.900(A)(2) NMAC will always be April 9, 1997. After that date, the financial assurance requirements are simply applicable to everyone, and the remaining categories listed in 20.9.1.900(A)(2) NMAC are rendered irrelevant.

{13} Under our interpretation, Appellant's argument regarding 20.9.1.900(A)(2) NMAC fails. We have stated that, after April 9, 1997, the financial assurance requirements are "applicable" as to all owners and operators of landfills. However, as we detail below, the bare fact that the requirements have become applicable does not dictate that all of the particulars detailed in Subpart 900 must be satisfied before a permit can be issued. Rather, we take 20.9.1.900(A)(2) NMAC to be nothing more than an "effective date" provision. Since the effective date has now passed (and since it had passed before Tucumcari filed its permit application) we determine that 20.9.1.900(A)(2) NMAC is no longer relevant and does not help Appellant.

{14} We now turn to Appellant's central contention, which is that a permit cannot be granted unless a permit applicant provides "an unqualified opinion from an accountant covering its *latest* fiscal year" that is "available for public review during the permitting process." Contrary to Appellant's argument,

the hearing officer found that the financial statement requirement "does not obtain at the time of [the] permit application," but rather, "the proper reports must be in place before waste is received."

{15} It appears that the only financial statement Tucumcari submitted with its application was a "draft audit" for the year 2002, and that document contained a "qualified" opinion. It is undisputed that Tucumcari did not submit any financial statement for 2004, which would have been the latest fiscal year. However, we agree with the hearing officer's determination. We are not persuaded that the regulations require the submission of a year-end financial statement from the latest fiscal year before a permit can be granted.

{16} In support of its argument regarding the year-end financial statement, Appellant relies on 20.9.1.900(F)(6)(d)(i) NMAC, which is titled "Record keeping and reporting requirements." That regulation states that the owner or operator must place into its "operating record" "the local government's independently audited year-end financial statements for the latest fiscal year, including the unqualified opinion of the auditor." We agree with the hearing officer's interpretation of 20.9.1.900(F)(6)(d)(i) NMAC. Another section of the same paragraph, 20.9.1.900(F)(6)(d)(ii) NMAC, states that the items required by 20.9.1.900(F)(6)(d)(i) NMAC, including the year-end financial statement, must be placed in the operating record "either before the initial receipt of waste at the facility or before the effective date of this Subpart [Subpart 900], *whichever is later.*" (Emphasis added.)

{17} As we have already established above, for all permit applications filed after April 9, 1997, the "effective date" of Subpart 900 is April 9, 1997. Accordingly, for all permit applications filed after April 9, 1997, 20.9.1.900(F)(6)(d)(ii) NMAC requires that the statements be placed in the operating record "before the initial receipt of waste at the facility," because that date will now always be "later" than the "effective date" of Subpart 900 (April 9, 1997). As such, we hold that Tucumcari was not required to obtain or submit the financial statement be-

fore issuance of the permit. Rather, after April 9, 1997, the regulations require only that an applicant place the appropriate statement in its operating record before the initial receipt of waste. As we have noted, the Department in this case imposed a more stringent condition on Tucumcari, requiring that it obtain the financial statement prior to beginning construction.

{18} Our determination regarding the year-end financial statement is also supported by the plain language of 20.9.1.900(F)(6)(d)(i) NMAC. The regulation states that the financial statements must be placed in the facility's "operating record." Another regulation defines "operating record": "Owners and operators of solid waste facilities shall make and maintain an operating record during the active life of the facility, for each day that operations, monitoring, closure, or post-closure activity occurs." 20.9.1.109(A) NMAC (1995). Under this regulation, it is clear that a landfill is not required to maintain an "operating record" if the facility is not "active." Moreover, it is common sense that a facility would not keep an "operating record" during the permit process before the facility is actually ready to become operational. Accordingly, we hold that 20.9.1.900(F)(6)(d)(i) NMAC did not require Tucumcari to possess "an unqualified opinion from an accountant covering its latest fiscal year" before it could obtain a permit.

{19} We are similarly unpersuaded by Appellant's reliance on 20.9.1.900(F)(6)(d)(v) NMAC, which states that "[a] local government must satisfy the requirements of the financial test at the close of each fiscal year." By its plain language, the statement that the requirements must be satisfied every year does not indicate that any particular financial documents must be in place before a permit can be granted. Rather, 20.9.1.900(F)(6)(d)(v) NMAC, which goes on to describe the steps that must be taken by an owner or operator who initially satisfied the local government financial test but can no longer do so, appears to address ongoing compliance by an already operational facility. Thus, we reject Appellant's argument involving 20.9.1.900(F)(6)(d)(v) NMAC.

{20} Appellant next argues that the Secretary "waived" "the requirement[s] for yearly financial statements," an action that is not permitted by the relevant regulations. (Emphasis omitted.) We disagree that the Secretary "waived" the requirements. As we held above, the regulations did not require Tucumcari to have the relevant financial documents in place at the time it applied for a permit. Rather, the regulations were satisfied as long as the Department required that Tucumcari have the documents in place, at the latest, before it starts accepting waste at the new facility. Accordingly, the Secretary did not "waive" any requirements of the regulations.

{21} In connection with its argument regarding the Secretary's purported "waiver" of the financial assurance requirements, Appellant also cites 20.9.1.900(F)(6)(b)(iii) NMAC. That regulation provides that an owner or operator is "not eligible" to use the local government financial test if it "receives an adverse opinion, disclaimer of opinion, or other qualified opinion from the independent certified public accountant ... auditing its financial statement as required under [20.9.1.900(F)(6)(b)(ii) NMAC]." The regulation goes on to provide that even if an owner or operator does receive a "qualified opinion," the Secretary has discretion to continue to allow use of the local government financial test.

{22} In this case, Tucumcari did submit an opinion from its accountant. The document was from 2002 and contained a " 'qualified' ... opinion." Pursuant to 20.9.1.900(F)(6)(b)(iii) NMAC, the Secretary decided to allow Tucumcari to continue using the local government financial test despite the qualified opinion.

{23} We reject Appellant's argument that 20.9.1.900(F)(6)(b)(iii) NMAC requires an applicant to submit a financial statement "for the most recent fiscal year" and that the Secretary "waived" this requirement. The regulation does mention a "financial statement as required under [20.9.1.900(F)(6)(b)(ii) NMAC]." (As we have noted, 20.9.1.900(F)(6)(b)(ii) NMAC states only that "The owner or operator must prepare its financial statements in conformity

with Generally Accepted Accounting Principles for governments."). However, 20.9.1.900(F)(6)(b)(iii) NMAC makes no mention of any requirement that a statement must be "from the latest fiscal year." *Cf.* 20.9.1.900(F)(6)(d)(i) NMAC (noting that "financial statements *for the latest fiscal year*" must be placed in a facility's operating record (emphasis added)). Under these circumstances, we think the Secretary had discretion to rely on the 2002 financial statement in determining whether Tucumcari satisfied the financial assurance requirements.

{24} Appellant also appears to argue that the Department itself recognizes that a financial statement from the latest fiscal year is required. Appellant cites a memorandum that appears in the record. The memorandum states that the regulations require "supporting documentation, none of which was included with the application." It then states, "The applicant needs to provide a copy of the independently audited year-end financial statements from the latest fiscal year, including the unqualified opinion of the auditor." We question whether this document is really a memorandum from the Department to Tucumcari, as Appellant contends, rather than some type of an interoffice memorandum from within the Department. At any rate, we note that the document is from "E. Gifford Stack." Appellant has not indicated who Mr. Stack is, but clearly he is not the Secretary. Accordingly, we reiterate our conclusion that the Secretary had discretion to rely on the 2002 financial statement.

{25} Next, we address Appellant's argument that 20.9.1.200(A)(2)(d) NMAC mandates that the documentation described in 20.9.1.900(F)(6) NMAC, and specifically the year-end financial statement described in 20.9.1.900(F)(6)(d)(i) NMAC, must be in place before a permit can be granted. 20.9.1.200(A)(2)(d) NMAC simply states that all permit applications shall "comply with the financial assurance requirements as specified in Subpart [900]." In the foregoing discussion, we have held that the regulations governing financial assurance do not require an applicant to submit the year-end financial statement prior to getting a permit. Accordingly, we reject the argument that

20.9.1.200(A)(2)(d) NMAC imposes such a requirement. Rather, we assume that as long as the central requirement involving financial capacity as shown by credit rating or financial ratio, *see* 20.9.1.900(F)(6)(b)(i) NMAC, is satisfied, a permit applicant will be in compliance with 20.9.1.200(A)(2)(d) NMAC. Because Tucumcari made the necessary showing in its application in this case, we hold that the Secretary did not err in granting the permit.

{26} Appellant next argues that it is important for a permit applicant to make its financial information available to the public during the permitting process so that the public can be informed and participate in the process. In support of its argument, Appellant cites the following statutes: Section 74-9-22, which states that each application shall contain "documentary proof that the applicant has provided notice of the filing of the application to the public and other affected individuals and entities"; Section 74-9-23(B), which states that, after determining that a permit application is complete, the Secretary shall hold a public hearing and give proper notice of that hearing; and Section 74-9-24(A), which states that the Secretary must either issue or deny a permit after a public hearing has been held. Appellant also cites 20.9.1.200(A)(3)(f)(v) NMAC, which states that the notice that the applicant must provide to the public and interested parties shall contain "a statement that comments should be provided to the applicant and the Department."

{27} We do not disagree with Appellant that these authorities support the general proposition that notice and public participation are important to the permitting process. However, none of these authorities support the more specific proposition that all of the requirements mentioned 20.9.1.900 NMAC must be satisfied at the time that an applicant submits its permit application. Accordingly, we reject Appellant's argument involving the above authorities.

{28} Appellant also relies heavily on a recent case from our Supreme Court, *Colonias Development Council*, 2005–NMSC–024, 138 N.M. 133, 117 P.3d 939. *Colonias* involved a landfill permit application that was highly contested by the community. *Id.*

¶¶ 2–4. After several public hearings at which sixty people spoke, the hearing officer issued a report recommending that the permit be granted. *Id.* ¶¶ 3, 6. While there appeared to be no dispute that the public had been afforded an adequate opportunity to be heard, the hearing officer had erroneously concluded that the lay testimony was irrelevant to the permit process because that testimony was "beyond the scope of the Secretary's authority for granting or denying a landfill." *Id.* ¶ 33. The hearing officer apparently refused to consider the public comment, believing that the grant or denial of the permit should be based only on whether the technical requirements of the Solid Waste Act and the relevant regulations were satisfied. *See id.* ¶ 10. Our Supreme Court set aside the Secretary's final order and remanded for a limited public hearing, concluding that "the hearing officer erred in characterizing testimony relating to the community's quality of life as irrelevant." *Id.* ¶¶ 36, 42.

{29} Like the other authorities cited by Appellant, *Colonias* supports the general proposition that public comment is important to the permitting process. Indeed, *Colonias* held that the hearing officer was not permitted to allow public comment, but then completely disregard it. Appellant in this case has not argued that, as in *Colonias,* the hearing officer or the Secretary completely disregarded Appellant's input. Rather, Appellant appears to rely on *Colonias* for the proposition that the Department erred in granting the permit without detailed financial information being made available to the public during the permitting process. We disagree that *Colonias* can be read so broadly, and we do not find it persuasive in this case.

{30} Finally, we address Appellant's cursory argument, contained in one paragraph of the brief in chief, that substantial evidence does not support the Secretary's determination that Tucumcari satisfied the financial assurance requirements. We reject Appellant's substantial evidence argument. We have already noted that Tucumcari submitted as part of its application a statement from its chief financial officer demonstrating that the City meets the requirements of 20.9.1.900(F)(6)(b)(i) NMAC. The record also contains a "draft" audit for the year 2002, as well as documentation involving estimated closure and assessment costs for the new landfill. In view of our prior holdings that the regulations do not require specific documents (such as a year-end statement for the latest fiscal year) to be in place before a permit can be granted, we hold that the foregoing constitutes substantial evidence on which the Secretary could have concluded that Tucumcari satisfied the financial assurance requirements.

**2. The Secretary's Findings Were Supported by Substantial Evidence, and The Secretary Did Not Abuse His Discretion or Act Arbitrarily or Capriciously**

{31} Appellant next attacks a number of the Secretary's specific findings, contending that the Secretary either abused his discretion, acted arbitrarily and capriciously, or made findings that were not supported by substantial evidence. We now address each of the contested findings.

**a. The Secretary's Findings Involving Tucumcari's Compliance with Regulations at Its Existing Landfill**

{32} Appellant first challenges the Secretary's findings that (1) "[Tucumcari] has not failed to demonstrate a knowledge and ability to operate a facility in accordance with the [regulations] or a history of non-compliance with environmental regulations or statutes at other facilities"; (2) the Application demonstrated that "neither a hazard to public health, welfare[,] or the environment nor undue risk to property will result"; and (3) Tucumcari's past failings do not "rise to the level of 'willful disregard for the Solid Waste Act, or failure to demonstrate the ability to operate a landfill in accordance with the [r]egulations, that warrants denial of the permit application.' "

{33} These findings correspond to 20.9.1.200(L)(16) NMAC, which lists a number of circumstances that constitute "cause[ ] for denying a permit application." Two of those circumstances are that (1) the applicant has "fail[ed] to demonstrate a knowl-

edge and ability to operate a facility in accordance with [the regulations] or [has] a history of non-compliance with environmental regulations or statutes at other facilities," 20.9.1.200(L)(16)(d) NMAC, and (2) "the permitted activity endangers public health, welfare[,] or the environment," 20.9.1.200(L)(16)(c) NMAC. Appellant also relies on a similar regulation that states that "The Secretary shall issue a permit if the ... application demonstrates that neither a hazard to public health, welfare[,] or the environment nor undue risk to property will result." 20.9.1.200(L)(10) NMAC. Finally, Appellant appears to rely on 20.9.1.200(L)(13)(e) NMAC, which states that the Secretary "may deny any permit application" if the applicant has "exhibited a history of willful disregard for the environmental laws of any state or the United States."

{34} Appellant's general contention with regard to all of these findings is that the Secretary should not have granted the permit for the new landfill in view of Tucumcari's poor history of compliance with relevant laws at its existing landfill. Appellant makes three specific arguments with regard to the above findings: (1) the findings are bare conclusions not supported by substantial evidence, (2) the findings are in error because the Secretary failed to consider Tucumcari's long and serious history of noncompliance at its existing facility, and (3) the Secretary erred because Tucumcari's past failures to demonstrate financial assurance indicate that the new landfill will likely be "a hazard to public health, welfare[,] or the environment." 20.9.1.200(L)(10) NMAC.

{35} Before addressing Appellant's specific arguments, we first note that the regulations cited by Appellant state only that the specified findings provide "cause" to deny a permit. Moreover, 20.9.1.200(L)(10) NMAC does not affirmatively state that a permit must be denied if the facility will create a hazard, but states only that the Secretary "shall issue a permit" if "the solid waste facility application demonstrates that neither a hazard to public health, welfare[,] or the environment nor undue risk to property will result."

{36} Given the permissive language of these regulations, we note that the Secretary would have discretion to grant a permit even if he found that some of the above-stated "causes" for permit denial were present. *See Joab, Inc. v. Espinosa,* 116 N.M. 554, 559, 865 P.2d 1198, 1203 (Ct.App.1993) (noting that regulations do not require an affirmative showing of the knowledge and ability to operate a facility, but rather, the Secretary has discretion to deny a permit "if the applicant fails to show the knowledge and ability to operate a facility"; holding that where the record showed that the applicant had operated a landfill in the past and where the application contained plans for how the landfill would be operated, the Secretary did not err in granting the permit). Accordingly, we think the real question is whether the Secretary abused his discretion or acted unreasonably in concluding that Tucumcari's past problems were not severe enough to warrant a discretionary denial of the new permit.

{37} Appellant makes the following argument:

[h]ad the Secretary considered and properly [weighed] all of the evidence, he could not have reasonably concluded that Tucumcari does not have a history of noncompliance with environmental laws at its current landfill, that Tucumcari demonstrated a knowledge and ability to operate a landfill in accordance with the [r]egulations, or that it demonstrated that neither a hazard to public health, welfare[,] or the environment nor undue risk to property will result from the [n]ew [l]andfill.

We suspect that Appellant's goal is to have this Court reweigh the facts in order to evaluate the Secretary's exercise of his discretion. We decline to do so. *See Tallman v. ABF (Arkansas Best Freight),* 108 N.M. 124, 127–28, 767 P.2d 363, 366–67 (Ct.App. 1988) (noting that even under whole record review, "[a] reviewing court may not reweigh the evidence," but should only determine whether, in light of the whole record, the result reached is reasonable), *modified on other grounds by Delgado v. Phelps Dodge Chino, Inc.,* 2001–NMSC–034, ¶ 27, 131 N.M. 272, 34 P.3d 1148. Rather, we think the

Secretary is in the best position to determine what constitutes a "lack of knowledge and ability" or "a history of non-compliance" sufficient to warrant the discretionary denial of a permit. As long as the Secretary's decision is supported by substantial evidence and is not unreasonable, we will affirm it.

{38} With regard to Appellant's first argument, we conclude that the contested findings are supported by substantial evidence. Evidence was submitted to the hearing officer indicating that Tucumcari has had a poor history of compliance with environmental laws at its existing facility. For example, the record contains a letter from the Department to the City indicating that there is a plume of contaminated water beneath the City's existing landfill. The record also shows that Tucumcari has failed in the past to comply with regulations governing monitoring of groundwater. The record also indicates that Tucumcari's inspection reports regularly revealed that blowing trash was leaving the landfill and littering neighboring properties.

{39} However, there is also evidence in the record that indicates that Tucumcari made efforts to deal with the compliance problems and that the problems may not have been as severe as Appellant makes them out to be. For example, a Department witness testified that, Tucumcari's compliance with regard to issues other than litter was "average." The same witness stated that the Department had never issued an administrative compliance order to Tucumcari because Tucumcari always corrected problems when the Department sent notices of violation. Moreover, several of the Department's witnesses testified that these past problems did not constitute an adequate reason to deny the permit. Together, the above constitutes substantial evidence on which the Secretary could have based the contested findings.

{40} With regard to Appellant's second argument, we disagree that the Secretary erred in failing to consider Tucumcari's past compliance problems. For example, the hearing officer's report notes that Tucumcari has had a "poor compliance history" regarding litter and that the City "has not proceeded expeditiously" in dealing with groundwater contamination problems. However, the

officer stated that Tucumcari's actions "do not rise to the level of . . . failure to demonstrate the ability to operate a landfill in accordance with the [r]egulations." The officer also concluded that "the more appropriate remedy considering the totality of circumstances is vigorous enforcement at the old landfill rather than permit denial for the proposed new landfill." Finally, we note that the Secretary, in his final order adopting the hearing officer's report, imposed an additional condition on the permit: making specific reference to Tucumcari's compliance history, the Secretary required an interim review, to be conducted two years after the facility begins operations, in order to assess Tucumcari's compliance. These statements from both the hearing officer and the Secretary indicate that the Department properly considered Tucumcari's past compliance problems and reasonably concluded that they did not warrant denial of the permit.

{41} We next address Appellant's third argument, which is that Tucumcari's past failures to satisfy the financial assurance regulations indicate that the new landfill will be "a hazard to public health, welfare, or the environment or [will cause] undue risk to property." Appellant also appears to argue that these alleged past failures in the area of financial assurance indicate that Tucumcari lacks the knowledge or ability to operate a landfill in compliance with the regulations and that Tucumcari has a history of non-compliance with the regulations at its existing landfill. We are not persuaded that the Secretary erred.

{42} Appellant has not provided any citations to the record proper in support of its contention that Tucumcari has failed to satisfy the local government financial test with regard to its existing landfill. However, we assume that Appellant is referring to the apparent fact that Tucumcari has not provided the Department with a financial statement for any year since 2002. We have held that 20.9.1.900(F)(6)(d)(i) NMAC, which requires an owner or operator to place in its operating record "the local government's independently audited year-end financial statements for the latest fiscal year," does not require an applicant to provide the statements during the

application process. However, we agree with Appellant that the regulation clearly requires an owner or operator to keep such statements, including one from the latest fiscal year, in its operating record. Because Tucumcari did not provide such statements from 2003 or 2004 in its application, but did include the statement from 2002, we assume that Tucumcari did not have the required statements in the operating record for its existing landfill.

{43} However, we are not persuaded that Tucumcari's apparent failure to obtain the financial statements leads to any of the conclusions argued by Appellant. We have a difficult time seeing how failure to obtain up-to-date financial statements indicates . that the new landfill will present a health hazard. Nor do we see how it indicates a lack of knowledge or ability to operate the new landfill in a safe manner. We do not disagree that Tucumcari's past failures in this regard show "non-compliance" with the applicable regulations. However, as we have stated, in the absence of a showing of unreasonableness, we will defer to the Department's interpretation of what constitutes a "history of non-compliance" severe enough to warrant the discretionary denial of a permit. In this case, we do not think Appellant has demonstrated such a severe history of non-compliance with the financial assurance regulations that this Court should override the Secretary's discretionary decision that past problems with financial compliance did not warrant the denial of a permit. We conclude that the Secretary did not abuse his discretion or act arbitrarily or capriciously in exercising his discretion to grant the permit despite Tucumcari's past instances of non-compliance with the financial assurance requirements.

{44} Before moving on to Appellant's remaining arguments, we note that not only is the Secretary in the best position to consider what level of past non-compliance with the regulations is sufficient to warrant permit denial, but the Secretary is also in the best position to consider more global policy concerns that might weigh against or in favor of granting a permit. For example, the hearing officer heard expert testimony that

Tucumcari's current landfill was built before the regulations were enacted and that it is unlined. The same expert also testified that cities are being encouraged to close unlined landfills "as soon as they can and dispose of their waste in a properly constructed, lined landfill." A hydrologist who works for the Department also testified that a lined landfill is "[b]y far" more protective of groundwater than an unlined landfill. In view of this information, the Secretary might have concluded that a new landfill would be in the best interests of the residents of Tucumcari and the surrounding areas. In sum, our review of the record persuades us that the Secretary's decision to issue the permit was supported by substantial evidence and was neither unreasonable nor arbitrary and capricious.

**b. The Secretary's Finding that the Department Need Not Consider Whether a City "Needs" a New Landfill or Whether Some Other Option Would Be More Appropriate**

{45} Appellant next argues that

[w]here applicants fail to demonstrate a knowledge of and ability to operate in accordance with the [r]egulations, and where applicants have a history of non-compliance at other facilities, the Secretary has a duty, as a matter of public policy, to consider whether he should deny a new landfill permit to such a bad actor and require the bad actor to manage its solid waste in another way less threatening to the environment.

Appellant refers to the statement in the hearing officer's report that "Neither the Act nor the [r]egulations contemplate that the [Department] will determine whether a particular permit applicant ... 'needs' a landfill, or would make a 'better choice' with a transfer station." Appellant apparently contends that, before granting the permit, the Secretary was required to consider whether it would be more appropriate for Tucumcari to build a transfer station instead of a new landfill. Other than arguing that this specific duty is "inherent" in the Secretary's general obligation to protect the public health, welfare, or environment, Appellant makes no

argument and cites no authority for this proposition, and we are thus entitled to assume that there is no applicable or analogous authority. *In re Adoption of Doe,* 100 N.M. 764, 765, 676 P.2d 1329, 1330 (1984). In the absence of any authority or persuasive argument, we reject Appellant's contention regarding a transfer station.

**c. The Secretary's Finding that the Depth Between the Bottom of the Landfill and Subsurface Water Would Be Sufficient to Comply With the Regulations**

■ {46} Appellant next attacks the Secretary's finding that "[t]he Application contained information that indicates the proposed landfill will not be located where depth to seasonal high water table will be closer than 100 feet to the bottom of the fill." This finding corresponds to 20.9.1.300(B)(1)(b) NMAC (1995), which states that "[n]o municipal or special waste landfill shall be located . . . where depth to seasonal high water table will be closer than 100 feet to the bottom of the fill." Appellant appears to make four arguments with regard to this finding: (1) the finding is not supported by substantial evidence; (2) three out of eight monitoring wells show that the depth to water is less than 100 feet, and the City impermissibly based its calculations on only the three deepest wells; (3) the map on which Tucumcari based its showing that the depth to water would be sufficient was flawed; and (4) the Secretary erred in failing to consider Appellant's arguments "based on the well schematics and the deficiencies in the 'Map.'" We reject Appellant's arguments.

{47} In determining that the new landfill would comply with the regulation prohibiting a landfill if the depth to water will be less than 100 feet, the hearing officer relied on the testimony of Mr. Miller, an expert hydrologist who testified for Tucumcari. Miller testified that the City had installed eight monitoring wells and that those wells showed that "the uppermost aquifer is greater than 100 feet below the fill in all areas of the landfill." One of the Department's witness also testified that the 100 foot siting requirement would be satisfied.

{48} Appellant's expert testified that "at six out of the eight wells, . . . the water is shallower than 100 feet from the bottom of the waste." However, it is clear that the hearing officer rejected this expert's calculations because they utilized the "potentiometric surface," which the hearing officer found to be a flawed method. It also appears that Tucumcari's own calculations indicate that two of the eight wells showed a depth to water of less than 100 feet. However, Miller testified on cross-examination that, while the figures did show that two of the wells hit water at a depth of less than 100 feet, "the water level in a well is not the determining factor of the regulations[;] it is the depth to the water table."

■ {49} Whether the depth to water at the landfill would be 100 feet or greater was a question of fact, and as long as the Secretary's finding on this issue is supported by substantial evidence, we will accord deference to the Secretary's finding. Particularly where specialized technical or scientific knowledge is involved, we will give great deference to an agency's factual findings. *See Gonzales v. N.M. Bd. of Chiropractic Exam'rs,* 1998–NMSC–021, ¶ 9, 125 N.M. 418, 962 P.2d 1253 ("In evaluating whether substantial evidence exists, this Court may properly give special weight and credence to findings concerning technical or scientific matters by administrative bodies whose members, by education, training or experience, are especially qualified and are functioning within the perimeters of their expertise." (internal quotation marks and citation omitted)); *Chavez v. Mountain States Constructors,* 122 N.M. 579, 583–84, 929 P.2d 971, 975–76 (1996) ("We will generally defer to an agency's factual determination, especially if the factual question concerns matters that fall within the agency's area of specialization."); *Attorney General v. N.M. Pub. Serv. Comm'n,* 111 N.M. 636, 642, 808 P.2d 606, 612 (1991) (giving "great deference" due to the agency's "expertise in [a] highly technical area").

{50} Here, given the testimony of Miller and the Department's witnesses, we cannot say that the Secretary's finding regarding depth to seasonal high water table is not supported by substantial evidence. Miller's

testimony alone provides substantial evidence on which the hearing officer and the Secretary could permissibly conclude that the regulation involving depth to water table would be satisfied. Appellant's assertions that the map used by Tucumcari was flawed and that the City improperly used only the deepest wells in calculating the depth to water table simply raised factual disputes that were for the hearing officer and the Secretary to resolve. Given our determination that Miller's testimony provides substantial evidence to support the depth-to-water-table finding, we will not substitute our judgment for the Department's reasoned and more educated judgment. *See Regents of the Univ. of Cal. v. N.M. Water Quality Control Comm'n,* 2004–NMCA–073, ¶ 29, 136 N.M. 45, 94 P.3d 788 (noting that in conducting substantial evidence review of an administrative action, we do not reweigh the facts).

{51} We also reject Appellant's argument that the Secretary acted arbitrarily and capriciously in failing to consider all of Appellant's arguments "based on the well schematics and the deficiencies in the 'Map.'" Appellant submitted 147 proposed findings of fact and 23 proposed conclusions of law. One section of the analysis portion of the hearing officer's report is devoted to the depth-to-water-table issue. The hearing officer makes reference to a section of Appellant's requested findings. The findings referenced include requested findings 81 and 84, which involved the well schematics and the map. The report then goes on to state that many of Appellant's proposed findings "are based on conjecture," "are taken out of context," or "lack evidentiary support completely." While the report does mention Appellant's proposed findings "54–87," findings 81 and 84 are not specifically mentioned by name.

{52} Appellant has not cited any authority indicating that a hearing officer acts arbitrarily and capriciously solely because the officer's report does not specifically discuss each and every one of a party's requested findings and conclusions. *See Atlixco Coal.,* 1998–NMCA–134, ¶ 24, 125 N.M. 786, 965 P.2d 370 (noting that an agency acts arbitrarily and capriciously when it "entirely omits consideration of relevant factors or important aspects of the problem at hand"); *cf. Cordova v. Taos Ski Valley, Inc.,* 121 N.M. 258, 264, 910 P.2d 334, 340 (Ct.App. 1995) (reviewing a workers' compensation judge's award of attorney fees for abuse of discretion; noting that "If the record reflects individualized consideration of a fee request without an arbitrary refusal or failure to consider a factor properly brought to the court's attention, then the appellate court should defer to the court's decision. We emphasize that it is [the] appellant's burden to demonstrate there has been a material refusal or failure to consider a relevant factor. A mere showing that the court rejected, disagreed with, or adopted a modified version of [the] appellant's position will not be deemed an abuse of discretion unless the court's decision is manifestly wrong or contrary to logic and reason.").

{53} In the absence of authority supporting Appellant's position, we will not presume error on the part of the Secretary. *See State ex rel. Reynolds v. Aamodt,* 111 N.M. 4, 6, 800 P.2d 1061, 1063 (1990) ("On review of the acts or orders of administrative bodies, the courts will presume, among other things, that the administrative action is correct and that the orders and decisions of the administrative body are valid and reasonable; presumptions will not be indulged against the regularity of the administrative agency's action." (internal quotation marks and citations omitted)). Rather, given the thoroughness of the hearing officer's report, we presume that the officer carefully considered all arguments, and we hold that the hearing officer and the Secretary did not act arbitrarily or capriciously in failing to mention by number some of Appellant's requested findings. *See Regents of the Univ. of Cal.,* 2004–NMCA–073, ¶ 35, 136 N.M. 45, 94 P.3d 788 (noting that an agency action is arbitrary and capricious where it is "unreasonable, irrational, wil[l]ful, and does not result from a sifting process." (internal quotation marks and citation omitted)).

**d. The Secretary's Refusal to Adopt Permit Conditions Requested by Appellant**

{54} Appellant next argues that the Secretary erred in failing to consider several

permit conditions that were requested by Appellant. The Solid Waste Act and the Department's regulations permit the Secretary to issue a permit with conditions. *See* § 74-9-24(A) (noting that the Secretary can issue a permit with terms and conditions). In this case, the Secretary imposed a number of conditions on the permit, including some requested by Appellant. The hearing officer's report states, "In preparing these conditions[,] I reviewed [Appellant's] submittal, along with several other parts of the record. I agreed with some of [Appellant's] proposed conditions; those I have not included either lack a sufficient evidentiary basis or seek something not required by the [r]egulations."

{55} With regard to the hearing officer's failure to accept all of Appellant's proposed permit conditions, Appellant argues that (1) in stating that the proposed conditions "lack [a] sufficient evidentiary basis," the hearing officer improperly placed the burden of proof on Appellant; (2) by "failing to consider" the conditions, the Secretary neglected to ensure that the new landfill would not be a hazard to public health; and (3) the Secretary erred in rejecting the conditions on the sole basis that they were not required by the regulations. We reject Appellant's arguments.

{56} With regard to the first argument, we disagree that the Secretary impermissibly shifted the burden of proof. Clearly, the burden was on Tucumcari to show that its application met all of the statutory and regulatory requirements for the granting of a new landfill permit. *See Joab, Inc.,* 116 N.M. at 557, 865 P.2d at 1201 (agreeing that a landfill permit applicant bears the burden of proof). However, we think it would be unreasonable to require the City to affirmatively prove that each one of Appellant's approximately 26 requested conditions was not necessary. Rather, where Appellant requested conditions that were not required by the relevant statutes and regulations, we think it fair to put the burden on Appellant to show that such conditions were necessary. *See Allsup v. Space,* 69 N.M. 353, 362, 367 P.2d 531, 536 (1961) (noting the "fundamen-

tal rule" that "the party alleging and seeking affirmative relief has the burden of proof").

{57} With regard to Appellant's second argument, we disagree that the hearing officer or the Secretary "failed to consider" Appellant's proposed conditions. At least three of the conditions recommended by the hearing officer and imposed by the Secretary were conditions requested by Appellant. Moreover, the hearing officer's report explicitly states that she "reviewed [Appellant's] submittal, along with several other parts of the record." Under these circumstances, we will not presume that the hearing officer or the Secretary refused to consider Appellant's proposed conditions. Similar to our views expressed above in the discussion of Appellant's requested findings of fact, the mere fact that the hearing officer's report does not contain a detailed discussion of each of the 26 requested conditions and why each one was rejected does not indicate that the officer refused to consider the conditions. Rather, given the hearing officer's explicit statement that she reviewed Appellant's proposed conditions, we conclude that the officer properly considered all of the proposed conditions and adopted only those that she thought were necessary to protect the public and the environment. *See Aamodt,* 111 N.M. at 6, 800 P.2d at 1063 (noting that courts presume regularity and correctness on the part of administrative bodies).

{58} We also reject Appellant's third argument, which is that the hearing officer and the Secretary erred in rejecting Appellant's proposed conditions on the sole basis that they were not required by the regulations. Appellant contends that "[w]hat happened here is exactly what happened in *Colonias.*" Appellant relies on our Supreme Court's statement in *Colonias* that "the Department cannot ignore concerns that relate to environmental protection simply because they are not mentioned in a technical regulation." 2005-NMSC-024, ¶ 34, 138 N.M. 133, 117 P.3d 939. We disagree that this situation is analogous to the situation in *Colonias.* In that case, our Supreme Court merely held that the Department was required to "consider" public comment involving environmental concerns. *See id.* ¶ 24 (holding that "the

hearing officer must listen to concerns about adverse impacts on social well-being and quality of life, as well as report them accurately to the Secretary" and that "[i]n reviewing the hearing officer's report, the Secretary must consider whether lay concerns relate to violations of the Solid Waste Act and its regulations"). Here, we have already concluded that the hearing officer and the Secretary did properly consider Appellant's proposed conditions. That is all that is required by *Colonias.*

{59} We also disagree with Appellant that the hearing officer and the Secretary impermissibly rejected Appellant's proposed conditions on the sole basis that the conditions requested measures not required by the regulations. As we have noted, both the hearing officer and the Secretary imposed a number of conditions that were not required by the regulations. The logical inference from this action is that both were aware that they had the authority to impose conditions as necessary, whether or not such conditions were mandated by the regulations. Indeed, we think the whole idea of a "condition" suggests something more than what is already required by the regulations. *Cf. Phelps Dodge Tyrone, Inc. v. N.M. Water Quality Control Comm'n,* 2006–NMCA–115, ¶ 20, 140 N.M. 464, 143 P.3d 502 [No. 25,027 (June 15, 2006)] (discussing the differences between conditions and regulations). In view of the officer's and the Secretary's obvious awareness that they had authority to impose conditions not required by the regulations, we agree with the Department that the hearing officer's statement that she was rejecting the proposed conditions because they "[sought] something not required by the regulations" merely indicates that she thought they were not necessary to protect public health and safety or the environment. Having rejected all three of Appellant's arguments with regard to its proposed conditions, we hold that the Secretary did not err in refusing to impose those conditions.

### e. The Secretary's Finding that an Additional Monitoring Well Was Not Necessary

{60} Finally, Appellant makes a more specific argument that the Secretary erred in refusing to impose one particular condition. Appellant requested the following condition:

> Within 90 days of [the] final approval of this permit, the City must install in compliance with the Solid Waste Regulations at least one additional monitoring well at least 200 feet deep on that portion of the City-owned property that is closest to [Appellant's] windmill, not more than 50 feet from the Southeast corner of the City's property.

With regard to this requested condition, the hearing officer stated,

> I did consider the windmill stock well on [Appellant's property], but it is cross-gradient from the disposal area, and completed in a deeper formation. The wells already drilled, particularly [monitoring well 5], will be "sentry wells" for the time being; if contamination is found at the site in the future, additional wells and remediation can be required then.

{61} Appellant argues that "[t]he Secretary did not have substantial evidence supporting his conclusion that an additional monitoring well was not necessary in the Chinle formation [i.e., near Appellant's windmill] to protect public health, welfare[,] and the environment and prevent undue damage to property." Appellant also attacks the factual determinations in the report that (1) an additional monitoring well is not necessary because the windmill well is "cross-gradient from the disposal area" and (2) monitoring well 5 can act as a "sentry well." We reject Appellant's arguments.

{62} First, we disagree with Appellant's characterization of the applicable burden of proof. As we stated above, the permit applicant bears the burden of proving that the application meets all of the requirements of the relevant statutes and regulations. However, to the extent that another party argues for a condition that is not required by the relevant laws, the burden of proof should be on that party. *See Allsup,* 69 N.M. at 362, 367 P.2d at 536 (noting the "fundamental rule" that "the party alleging and seeking affirmative relief has the burden of proof"). We do not think it appropriate to place the burden on the applicant to prove lack of

necessity with regard to every condition proposed by any party. Rather, we think the burden was on Appellant to affirmatively show that the requested condition was necessary to protect public health and the environment. The record shows that the hearing officer and the Secretary could have easily determined that Appellant failed to meet its burden with regard to the requested additional monitoring well.

{63} Appellant's expert testified that as to the "plain view," Appellant's windmill well is "cross-gradient" from the disposal area. But, he stated, the well is "downgradient vertically" from the disposal area. He also testified that "if there were any sort of vertical migration, it could potentially be a problem." The expert further testified that installing a monitoring well to protect Appellant's windmill well would be "the safest course of action." In view of the fact that Appellant's own expert testified only that contamination "might be a problem" and that the "safest" thing would be to drill an additional well, we conclude that the Secretary could have permissibly decided that Appellant failed to meet its burden of showing that the additional well was necessary.

{64} We also reject Appellant's argument that "reliance on the cross gradient position of the stock well does not in and of itself provide sufficient assurance to conclude that the permitted activity" will not create hazards to public health or the environment. We assume that the term "downgradient vertically" is supposed to refer to Appellant's expert's apparent allegation that, while the windmill well and the landfill site are at equal elevations at the surface, the well is downgradient from the site at a subsurface level. However, Appellant does not cite to any point in the record that would assist this Court in determining the exact meaning or significance of sites being "downgradient" or "crossgradient" from one another. *Cf. Clayton v. Trotter*, 110 N.M. 369, 373, 796 P.2d 262, 266 (Ct.App.1990) (noting that the appellant has a responsibility to put forth arguments that can be understood by the Court).

In view of the highly technical and fact-specific nature of this issue, we will defer to the Secretary's conclusion that the possible "downgradient" location of Appellant's well did not necessitate an additional monitoring well. *See N.M. Pub. Serv. Comm'n*, 111 N.M. at 642, 808 P.2d at 612 (giving "great deference" due to the agency's "expertise in [a] highly technical area").

{65} We similarly reject Appellant's contention that the hearing officer and the Secretary erred in concluding that monitoring well 5 could act as a "sentry well." The hearing officer's report does indicate, as Appellant points out, that monitoring will not occur at well 5 on an ongoing basis. However, we are not persuaded that this fact indicates error. The report states that "[t]he wells already drilled, *particularly [monitoring well 5]*, will be 'sentry wells.' " (Emphasis added). This language makes clear that the hearing officer was not relying solely on monitoring well 5, because the other wells are also capable of serving a monitoring function with regard to Appellant's windmill well. Accordingly, we will defer to the conclusion of the hearing officer and the Secretary that an additional monitoring well is not necessary to protect Appellant's property. *See id.* (giving "great deference" due to the agency's "expertise in [a] highly technical area"). We conclude that the Secretary did not err in refusing to impose Appellant's requested permit condition.

## CONCLUSION

{66} We affirm the Secretary's final order granting the permit to Tucumcari.

{67} **IT IS SO ORDERED.**

WE CONCUR: CYNTHIA A. FRY and RODERICK T. KENNEDY, Judges.